**Cedric Lamont RANSOM, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 71633.

Court of Criminal Appeals of Texas.

June 15, 1994.

Opinion after Grant of Rehearing Feb. 21, 1996.

Rehearing Overruled April 24, 1996.

David L. Richards, Fort Worth, for appellant.

Tim Curry, Dist. Atty., Betty Marshall, Charles M. Mallin, Lynn Allison Bollish, Alan Levy and Richard Bland, Asst. Dist. Attys., Fort Worth, Robert Huttash, State's Atty., Austin, for the State.

Lynn Allison Bollish, Asst. Dist. Atty., Fort Worth, Robert A. Huttash, State's Atty., Austin, for the State on rehearing.

*OPINION*

MALONEY, Judge.

Appellant was convicted of capital murder for a murder committed during the course of a robbery. Tex.Penal Code Ann. § 19.03(a)(2). The jury returned affirmative findings to the two special issues submitted to it and appellant was sentenced to death. Direct appeal to this Court is automatic. Tex.Code Crim.Proc.Ann. art. 37.071(h).

Appellant raises sixteen points of error, but because he does not challenge the sufficiency of the evidence we dispense with a recitation of the facts. We will reverse.

In his first point of error appellant claims the trial court erred in granting the State's challenge for cause against venireman Harold Freeman. The trial court granted the State's challenge on the ground that Freeman evidenced a prejudice or bias against the law as set forth in *Marras v. State*, 741 S.W.2d 395 (Tex.Crim.App.1987). Appellant relies on *Garrett v. State*, 851 S.W.2d 853, 860 (Tex.Crim.App.1993), in which we overruled *Marras*, and held that it is reversible error for the trial court to grant a challenge for cause based upon a venireperson's statement that he "would require more evidence than the legal minimum in order to

answer" the special issue on future dangerousness in the affirmative.[1]

During voir dire, in language indistinguishable from that at issue in *Garrett*,[2] Freeman asserted that he could *never* affirmatively answer the special issue on future dangerousness based solely on the evidence supporting the capital murder conviction. He stated that it would take more than the evidence supporting the defendant's guilt for capital murder to persuade him beyond a reasonable doubt that the defendant was a continuing danger to society.

The State concedes that under *Garrett* the trial court committed reversible error but presents four arguments which we will address separately. First, the State urges that we reconsider and overrule our holding in *Garrett*. Remaining convinced of the soundness of our reasoning in *Garrett*, we decline the invitation to overrule it. *See Sigler v. State*, 865 S.W.2d 957, 961 (Tex.Crim.App. 1993) (declining to overrule *Garrett*).

■ Secondly, the State urges that we apply *Garrett* only prospectively. We have addressed and rejected this argument previously. *Id.* (declining to apply *Garrett* only prospectively).

■ The State also argues that Freeman's exclusion was harmless in view of the fact that the State did not exercise all of its peremptory challenges, and therefore could have used one of its remaining peremptory strikes to exclude Freeman. The State concedes that in *Garrett* we held the error was reversible "notwithstanding that the State may have had peremptory challenges remaining at the conclusion of voir dire", but argues that in so holding we relied upon *Grijalva v. State*, 614 S.W.2d 420, 423 (Tex. Crim.App.1981), the rationale for which is inapplicable to the instant case.

In *Grijalva*, we held that peremptory challenges remaining at the end of the voir dire would not remove the harm of an erroneous grant of a State's challenge for cause. *Grijalva*, 614 S.W.2d at 425; *see also Bell v. State*, 724 S.W.2d 780, 795 (Tex.Crim.App. 1986) (explaining holding in *Grijalva*). We based this holding on our observation that the State would otherwise receive three unfair advantages over the defendant:

First, to allow the State to exercise its peremptory challenge in a capital case after conclusion of voir dire examination gives it the benefit of making its judgments with a perspective of the entire panel, a perspective not given the defendant.

Second, giving such a privilege to the State allows it to withhold its strikes until after the defendant has exercised his strikes, even though Art. 35.13, supra, explicitly states that the qualified venireman shall be passed first to the state and then to the defendant. The statute would give the benefit to the defendant in instances

---

1. At the time of Garrett's trial, the second special issue asked "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." TEX.CODE CRIM.PROC.ANN. art. 37.0711, § 3(b)(2). The code was subsequently amended so that at the time of appellant's trial, former special issue two had become special issue one. To avoid confusion, I will refer through-out this opinion to the special issue under discussion as the issue on future dangerousness.

2. Following is a portion of the exchange that took place between the prosecutor and Freeman in this regard:

   [Prosecutor:] ... the State of Texas brought to you the occurrence of one capital murder trial, one murder case, and nothing further, are you saying under those circumstances, that you could never answer Special Issue Number One "Yes"?

   [Freeman:] That's what I'm saying.

   \* \* \* \* \* \*

   Q. Now, my question to you is if the State proved to you that someone was guilty of capital murder, and we brought you no further evidence, on the basis of one single act of capital murder, could you ever answer Special Issue Number One "Yes" beyond a reasonable doubt?
   A. No, I could never answer it "Yes".
   Q. That is just on the basis of you would always require something in addition to the crime on trial; is that correct?
   A. Right.
   Q. And you feel fairly strongly about that, I take it?
   A. Yes, I would think anybody would.
   Thereupon the State challenged Freeman for cause. Appellant and the court also questioned Freeman on this issue and he continued to respond consistently with his previous answers.

where both sides might desire to strike the same venireman. Allowing the State to wait until the end of the selection process would transfer that benefit to the State.

Third, to allow retrospective exercise of peremptory challenges *on appeal* gives the State even greater advantages. When used on appeal the State effectively postpones exercise of its strikes until error has been found, and then with the benefit of the ruling of this Court as its guide the State can maximize the accuracy of the strikes not used at trial. In actuality this Court not only counsels the State, but actually exercises the strike for the State. In effect a peremptory strike against a prospective juror is transformed into a peremptory strike against a ground of error.

*Grijalva,* 614 S.W.2d at 424–25 (emphasis in original).

In the instant case, as in a non-capital case, all of the peremptory strikes by both parties were made after the completion of individual voir dire of all the venirepersons. The State argues that it would "gain no unfair advantage in this case from a retroactive strike because both sides exercised their strikes in view of the entire panel." This argument is based only upon the first of the three basis for our holding in *Grijalva.* The second and third advantages realized by the State, as set forth in *Grijalva,* are applicable here. Even under the method of selection employed in this case, the State would have the benefit of a "retroactive peremptory strike" after the defendant has made his strike or challenge rather than prior thereto as required by Tex.Code Crim.Proc.Ann. art. 35.13, and also after error has been found. Accordingly, *Garrett* and the underlying rationale set forth in *Grijalva* are applicable to the facts of this case.

Finally, the State posits that because a challenge against Freeman could be upheld on other grounds, the trial court's ruling should be sustained. The State points to Freeman's testimony that he was against the death penalty as sufficient to have justified a challenge for cause, citing *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Assuming, arguendo, that the State had challenged Freeman on the basis of *Wainwright v. Witt,* the trial court's excusal of Freeman would nevertheless be erroneous.

■ A venireperson's views about the death penalty will not subject him to a challenge for cause *unless* those views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath." *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980); *see also Cuevas v. State,* 641 S.W.2d 558, 563 (Tex.Crim.App. 1982); *Durrough v. State,* 620 S.W.2d 134, 142 (Tex.Crim.App.1981). When initially questioned by the State, Freeman stated that he was "against the death penalty" and expressed that he could never "vote for a death penalty." [3] However, when he was specifically asked whether he could follow the law and answer special issues, Freeman stated that his feelings about the death penalty would have no bearing on his role in answering the issues. Freeman never wavered in maintaining that his views about the death penalty would not affect his performance as a juror in answering the issues, even knowing what the ultimate outcome would be. Therefore, while he stated initially that he was against the death penalty and could not vote for it, once he took into account the proper role of the jury in answering the special issues rather than selecting the punishment, Freeman was *unequivocal* in stating that his views would not affect his performance. The State cites *Gunter v. State,* 858 S.W.2d 430 (Tex. Crim.App.), *cert. denied,* —— U.S. ——, 114 S.Ct. 318, 126 L.Ed.2d 265 (1993); however, in that case, the prospective juror vacillated as to whether her views about the death penalty would prevent her from answering the special issues in the affirmative.[4]

3. Attached as an Appendix to this opinion is the relevant portion of Freeman's voir dire testimony.

4. When initially asked by the State whether her views about the death penalty would prevent her

from answering the special issues, the venireperson at issue in *Gunter* stated "I don't know." Upon further questioning, she expressed equivocation, stating at one point that "since there is a doubt in my mind [as to whether she could ever

Appellant's first point of error is sustained. Appellant's conviction is reversed and this cause is remanded to the trial court.[5]

CAMPBELL, J., dissents for the reason that venireperson Freeman, although qualified under *Garrett v. State* was disqualified under *Wainwright v. Witt,* and therefore his excusal by the trial judge was proper.

WHITE and MEYERS, JJ., join this note.

### APPENDIX

this case. Perhaps the most important areas we want to ask you about are your feelings about the death penalty. So why don't we start out and ask you to explain to us how you feel about the death penalty as a possible punishment for a crime.

A. I am against the death penalty.

Q. And how long have you been against the death penalty?

A. Probably a decade.

Q. Okay. And why are you against the death penalty?

A. I don't believe the facts bear out the fact that it is a deterrent. And that is the usual major argument for it.

Q. So if you were designing the laws of our state, or the United States laws, you would fashion something other than the death penalty as a punishment for a crime? Is that a fair statement?

A. Correct.

Q. How strongly are you against the death penalty? Are you strong enough

against it where you feel like you cannot take an oath to follow that law if you were selected as a juror in a case?

A. Yes. I don't believe I could ever vote for a death penalty.

Q. When you say you could never vote for it, I take it that's about as strong a feeling as ever comes down the pike, I take it?

A. Right.

Q. You are saying that there is no set of facts for which you could ever vote for the death penalty?

A. I believe. I can't imagine a set of facts like that.

Q. Have you ever heard of a case where you could vote for the death penalty, if you thought the facts justified it?

A. No.

Q. I take it, then, that you are coming in here with a predisposition against the death penalty as a punishment for a crime?

A. Yes.

Q. We often use the terms "bias" and "prejudice". Bias and prejudice simply mean having a predisposition, and a fairly strong predisposition. Would you say that you have a bias and a prejudice against the death penalty as a punishment for a crime?

A. Your definition, I am not sure. If bias and prejudice means prejudgment without some study, no. If it means an inclination, yes.

Q. How about a prejudgment with some study?

A. Okay. Fine.

answer the special issues yes] it would be better for me to say no." Thereafter, she continued to say that she could not answer the special issues yes. Upon further questioning by the State, she indicated that answering the special issues yes would violate her conscience and therefore she could not take the juror's oath. *Gunter,* 858 S.W.2d at 440–43.

5. In the case of a capital murder where the death penalty has been assessed, when reversible error is found on appeal which "affect[s] punishment only, the court shall not set the conviction aside *but rather shall commence a new punishment hearing....*" Tex.Code Crim.Proc.Ann. art. 44.29(c). The question, therefore, is whether the

State's erroneously granted challenge for cause "affect[s] punishment only". We conclude it does not. We note initially that article 44.29(c) does not set forth a "harmless error test". Therefore, we do not need to decide whether the error contributed to the conviction or the punishment, but merely whether the error was one "*affecting* punishment only". We cannot say that in the case of an erroneously granted challenge for cause that it "affect[ed] punishment only", even though the challenge was based on a punishment issue. This is because the erroneous elimination of a venireperson conceivably affects the composition of the jury, which sits at both guilt and punishment.

Q. If we use that definition for prejudice, will you find yourself with a prejudice against the death penalty as a punishment for a crime?

A. Yes.

Q. The State has a burden of proof at the first phase of the trial to prove someone is guilty beyond a reasonable doubt. And if we prove someone's guilty beyond a reasonable doubt, we are entitled to have a jury vote guilty. With your strong predisposition against the death penalty, are you saying that if the State proved to you that someone was guilty beyond a reasonable doubt, that you would find yourself unable to vote guilty, knowing the death penalty was a possible punishment?

A. No, I believe that I could vote guilty on the indictment.

Q. Okay. Then if that happened, we would enter into the second phase of the trial of a capital murder case in which there are two possible punishments; one being a sentence of life in prison, and the other being the death penalty. Would your predisposition against the death penalty cause you to always vote in favor of a life sentence, rather than the death penalty as a punishment?

A. As I understand it, the Jury does not set the penalty, right? The Judge does that?

Q. That's right.

A. So your question was?

Q. What a Jury does, is the Jury answers the special issues.

A. These questions?

Q. Right.

A. Right.

Q. The way the special issues are answered tells the Judge what the Judge has to do. Going back in the jury room to deliberate on a case, you would know what the effects of your answers are. My question to you is knowing the effects of your answers, would you yourself always vote in a way the life sentence would be imposed, instead of the death penalty as a punishment?

A. No. I would try to address each of the three that we have, special issues, questions, individually, and answer it individually, knowing that, collectively, a group would answer, and the Judge would follow the dictates of the answers.

Q. Well, you told me a few minutes ago you were against the death penalty.

A. Right.

Q. Are you saying that your feelings against the death penalty would have no bearing on your thinking if you were a juror in a case?

A. I believe that's true.

Q. You could totally set your feelings aside?

A. No. It's a matter of my distinguishing between my responsibility to determine the guilt or innocence on what is charged, my responsibility to answer the three questions, and there my responsibility ends.

Q. Okay. Let me go one step further and tell you that the Judge has no discretion to change your answers.

A. Right.

Q. And you would know the effects of your answers sitting back in the jury room. You would know if the answers came out "Yes", "Yes", "No", that the Judge has no choice but to give the death penalty.

A. Give me some information. As the questions are answered, does each juror know how every other juror is answering?

Q. Yes, they do.

A. They do? Okay. See, I didn't know that process.

Q. It takes a unanimous vote of all twelve jurors to answer a question "Yes", or at least each of the first two questions. If they are both answered "Yes", the Jury has decided to give the person the death penalty. And there is a third question which comes in. And if it is answered "No", then the Jury has no choice—well, the Jury has given the person the death penalty, or told the Judge—

A. Are these the same three issues that are in this paper?

Q. That's correct.

A. I believe that I could answer each of these honestly, straightforwardly, even knowing what the outcome would be. Just the commitment to integrity would drive me to answer each one honestly and not project back upon my answer the consequence.

Q. Okay. If I can read into what you were saying, if you were back in the jury room deliberating and deciding if a man was going to live or die, that wouldn't enter into your mind, if you were deliberating on these questions?

A. On these three?

Q. Yes.

A. Special Issue Number Three would be quite pointed, wouldn't it? Well, the question is: Do you find that there is a sufficient mitigating circumstance to warrant the sentence of life imprisonment.

Q. Yes, sir.

A. I would just try to answer that question.

Q. What do you mean by that?

A. Well, if I, in hearing the developments of the case, were to hear something that, in my judgment, would mitigate against the imposition of the death penalty, I would answer that "Yes".

Q. Okay. Given your feelings against the death penalty as a punishment for a crime, do you think you would have more of a tendency to find something mitigates against the death penalty than someone who had an open view to the death penalty as a punishment for a crime?

A. Well, one can never know that, but I would try not to, but it could happen.

Q. Okay. Let me tell you what my predicament is here, Doctor. I have a responsibility under the law to see that the State of Texas is fairly represented in this lawsuit.

A. Sure.

Q. And we are seeking the death penalty in this case. We are looking for a jury of twelve people who, fairly and impartially, can give consideration to the death penalty as a punishment for a crime. And, you know, given the facts that you told me a few minutes ago, that you are dead set against the death penalty, and you have been against the death penalty for at least a decade, I am trying to figure out in my mind how you can make the leap into forgetting about the death penalty and forgetting about sentencing someone to death and honestly answer these questions.

A. Well, in my mind, what's going on is that you are not asking me to decide whether the death penalty will be imposed or not. I am being asked to decide the guilt or innocence of the charge. I am being asked to answer three questions. And I can do that.

Q. The three questions come at the second phase of the trial. You already found someone guilty of capital murder. You found them guilty beyond a reasonable doubt.

A. Right.

Q. In the second phase of the trial, you are solely concerned with those three questions.

A. Right.

Q. Do you see what Question Number One is basically asking of you?

A. Yes.

Q. Do you think it's possible the State could prove to you beyond a reasonable doubt that someone may—that there is a probability they may be violent in the future?

A. I think that's possible. That's the second question, isn't it?

Q. That's actually the first question.

A. That the first one? Right, first one. Yes, I think that's possible.

Q. What type of evidence would you be looking for there?

A. Professional psychiatric, or psychological, sociological evidence.

Q. What type of psychological or sociological evidence would you feel that points toward someone being a threat?

A. Well, at this point, I don't know. That would be up to the professional.

McCORMICK, Presiding Judge, dissenting.

Adhering to the views expressed in my dissenting opinion in *Garrett v. State*, 851 S.W.2d 853, 861 (Tex.Cr.App.1993), I dissent to the sustaining of appellant's first point of error. I furthermore dissent to the majority's conclusion that prospective juror Freeman was not subject to a challenge for cause based upon his views in opposition to the death penalty.

## *OPINION ON STATE'S MOTION FOR REHEARING*

KELLER, Judge.

In our original opinion, we reversed and remanded this cause for a new trial on the basis of *Garrett v. State*, 851 S.W.2d 853 (Tex.Crim.App.1993). On rehearing the State urges that *Garrett* error is "error affecting punishment only," and that, therefore, this case should be remanded for a new punishment hearing only, in accordance with Art. 44.29(c).[1] We agree. Because of our disposition on rehearing, we must address appellant's other points of error. Finding none with merit justifying reversal of the conviction, we affirm the conviction but vacate the sentence and remand for a new sentencing hearing.

### 1. *Garrett* error

■ Voir dire error does not inevitably affect the guilt/innocence phase of a trial. In *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the United States Supreme Court indicated that the erroneous excusal for cause of a venireman for holding conscientious scruples about the death penalty did not affect the capital murder conviction but merely invalidated the death sentence. *Id.* at 517–518, 88 S.Ct. at 1774–1775. This conclusion was expressly adopted in *Bumper v. North Carolina*, in which the Supreme Court held that *Witherspoon* error did not require reversal of the

conviction because the defendant had been given a life sentence instead of the death penalty. 391 U.S. 543, 545, 88 S.Ct. 1788, 1789–90, 20 L.Ed.2d 797 (1968). In both *Witherspoon* and *Bumper*, the Supreme Court held that the defendant had the burden to bring forth evidence showing that the voir dire error necessarily produced jurors who were biased with respect to the question of guilt; because the defendants in those cases failed to present such evidence, the voir dire error did not affect their convictions. *Witherspoon*, 391 U.S. at 517–518, 88 S.Ct. at 1774–1775. *Bumper*, 391 U.S. at 545, 88 S.Ct. at 1789–90.

■ Following *Bumper*, we have held consistently that *Witherspoon* error does not govern the resolution of capital murder convictions that ultimately result in life sentences. *Garcia v. State*, 626 S.W.2d 46, 55 (Tex.Crim.App.1981). *Sanne v. State*, 609 S.W.2d 762, 768 n. 3 (Tex.Crim.App.1980), *cert. denied*, 452 U.S. 931, 101 S.Ct. 3067, 69 L.Ed.2d 432 (1981). *Phelps v. State*, 594 S.W.2d 434, 437 (Tex.Crim.App.1980). *White v. State*, 591 S.W.2d 851, 858 (Tex.Crim.App. 1979), *overruled on other grounds, Bigby v. State*, 892 S.W.2d 864 (Tex.Crim.App.1994). Because *Witherspoon* error has no application when life sentences are imposed, it follows that *Witherspoon* error relates only to punishment. And since *Witherspoon* error relates only to punishment, it further follows that death sentences in trials in which *Witherspoon* error occurred need only be reversed and remanded for a new punishment determination rather than a new trial on guilt.

In fact, in *Cuevas v. State*, 641 S.W.2d 558, 563 (Tex.Crim.App.1982), we recognized this, stating explicitly that *Witherspoon* error relates to penalty only. We reversed the conviction in *Cuevas* and remanded for an entirely new trial because at that time we lacked the authority to remand only on punishment. Art. 44.29(c) was amended in 1991,

---

1. All references to articles are to the Texas Code of Criminal Procedure unless otherwise provided.
   Art. 44.29(c) provides in relevant part: "If any court sets aside or invalidates the sentence of a defendant convicted of an offense under Section

19.03, Penal Code, and sentenced to death on the basis of any error affecting punishment only, the court shall not set the conviction aside but rather shall commence a new punishment hearing ... as if a finding of guilt had been returned."

however, and we now have such authority. Moreover, the language of Art. 44.29(c) is mandatory.

*Witherspoon* and *Garrett* are, in respects relevant to the present case, indistinguishable. Both relate to a prospective juror's opinion about issues to be decided during the punishment phase of a capital murder trial.

And although *Garrett* error is based upon state law rather than the federal Constitution, we do not believe that to be a material distinction here. In *Jones v. State*, 843 S.W.2d 487 (Tex.Crim.App.1992), *cert. denied*, 507 U.S. 1035, 113 S.Ct. 1858, 123 L.Ed.2d 479 (1993), a capital case, the appellant complained that he was erroneously denied the right to voir dire the jury on the parole laws applicable to the lesser included offense of murder. Ordinarily, when error stems from the refusal to permit proper voir dire questioning, harm is presumed, and the error is not subject to a harmless error analysis. *Nunfio v. State*, 808 S.W.2d 482, 485 (Tex.Crim.App.1991). But in *Jones* we held that any error was rendered harmless by the fact that the jury found the defendant guilty of capital murder and no parole instruction was given. *Id.* at 498. By holding the error to be harmless in *Jones*, we implicitly held that any voir dire error in that case related to punishment only. Had we presumed, as stated in footnote five of our opinion on original submission in this case, that voir dire error conceivably affects the composition of the jury, then the harmless error analysis in *Jones* would have been improper.

■ We hold that voir dire error regarding a subject that a jury would consider only during the punishment phase of a trial is "error affecting punishment only," unless the defendant produces evidence showing that the error necessarily produced a jury biased against the defendant on the issue of guilt. Since no such evidence has been produced in the present case, this cause should be remanded for a new hearing on punishment in accordance with Art. 44.29(c).

**2.** Such questioning is patently improper, as a defendant's minimum eligibility for parole is not a proper consideration for the jury in a capital case. *Broxton v. State*, 909 S.W.2d 912, 919

### 2. Errors affecting punishment only

■ Points of error eight through ten allege errors during voir dire. In point of error eight, appellant claims that he was not permitted to question a venireman about the range of punishment for the lesser included offense of murder. In point of error nine, appellant complains of the trial court's refusal to permit questioning regarding appellant's minimum eligibility for parole if given a life sentence.[2] In point of error ten, appellant alleges that the trial court erroneously sustained a state's challenge for cause in violation of *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Points of error fourteen and fifteen allege errors in the jury charge at punishment. In point of error fourteen, appellant complains that the punishment charge does not define the term "probability." Point of error fifteen complains of the trial court's failure to submit an instruction concerning parole. Finally, in point of error sixteen, appellant complains that he was prejudiced when a juror received a death threat during the punishment phase of the trial. All of these points of error relate to punishment only and are therefore moot in light of our disposition of point of error one.

### 3. Venue

In point of error four, appellant contends that the trial court erred in refusing to grant a change of venue based upon prejudicial publicity occurring after the voir dire stage of the trial. At the end of voir dire, while in the courtroom, appellant grabbed his attorney and held a sharp object to the attorney's throat. After a bailiff ordered appellant to release his attorney, appellant responded that the person he really wanted was the prosecutor; whereupon, appellant attacked the prosecutor and was finally restrained by one of the bailiffs. The prosecutor, the defense attorney, and one bailiff were injured during the episode. This incident was reported in the media and is the basis for appellant's motion for change of venue.

(Tex.Crim.App.1995). *Smith v. State*, 898 S.W.2d 838 (1995), *cert. denied*, — U.S. —, 116 S.Ct. 131, 133 L.Ed.2d 80 (1995).

■ A defendant has the right to a change of venue when there exists a prejudice in the county that is so great that he cannot receive a fair trial. Art. 31.03(a)(1). A trial court's determination of venue may be reversed only for an abuse of discretion. *Hathorn v. State,* 848 S.W.2d 101, 109 (Tex.Crim.App.1992), *cert. denied,* 509 U.S. 932, 113 S.Ct. 3062, 125 L.Ed.2d 744 (1993); *Narvaiz v. State,* 840 S.W.2d 415, 428 (Tex.Crim.App.1992), *cert. denied,* 507 U.S. 975, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993). The trial court has the task of acting as fact-finder on the venue question. *Hathorn,* 848 S.W.2d at 109. Its decision will not be disturbed so long as it is within the realm of reasonableness given the record before it. *Narvaiz,* 840 S.W.2d at 428.

■ The trial court found that the publicity occurred after the jury had been selected and after the jury had been instructed to avoid media coverage of the case. The trial court subsequently questioned the jurors, and only one juror stated that she had been exposed to any publicity. She stated that she had heard only very brief fragments of a report about the incident before turning off the radio. Although she maintained that she had not formed an opinion as to appellant's guilt, the trial court excused her and replaced her with an alternate. The trial court did not abuse its discretion in denying appellant's motion. Point of error four is overruled.

### 4. Extraneous offenses

#### a. The courtroom incident

■ In point of error two, appellant complains that the admission into evidence during the guilt phase of trial of testimony concerning the assault in the courtroom violated the prohibition against extraneous offense evidence found in Rule 404(b).[3] Rule 404(b) provides in relevant part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in

conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

We have held that criminal acts that are designed to reduce the likelihood of prosecution, conviction, or incarceration for the offense on trial are admissible under Rule 404(b) as showing "consciousness of guilt." These include threats against the prosecutor, *Johnson v. State,* 583 S.W.2d 399, 409 (Tex. Crim.App.1979); threats against witnesses, *Rodriguez v. State,* 577 S.W.2d 491, 492–493 (Tex.Crim.App.1979) and their families, *Brown v. State,* 657 S.W.2d 117, 119 (Tex. Crim.App.1983); physical violence against witnesses, *Maddox v. State,* 288 S.W.2d 780, 782 (Tex.Crim.App.1956); escape from confinement, *Rumbaugh v. State,* 629 S.W.2d 747, 752 (Tex.Crim.App.1982); bail jumping, *Cantrell v. State,* 731 S.W.2d 84, 93 (Tex. Crim.App.1987); and the presentation of fake identification to the police, *Felder v. State,* 848 S.W.2d 85, 97–98 (Tex.Crim.App.1992), *cert. denied* —— U.S. ——, 114 S.Ct. 95, 126 L.Ed.2d 62 (1993). Attacks upon the prosecutor and the defense attorney in the courtroom during the trial of the case clearly fall within this category. The evidence was relevant to show consciousness of guilt. Point of error two is overruled.

■ In point of error three, appellant complains that the prejudicial effect of admitting this evidence substantially outweighed its probative value in violation of Rule 403.[4] The standard of review for a trial court's ruling on this issue is abuse of discretion. *Montgomery v. State,* 810 S.W.2d 372, 392 (Tex.Crim.App.1990). We have previously held that the probative value of a crime showing "consciousness of guilt" may outweigh its prejudicial impact. *Havard v. State,* 800 S.W.2d 195, 203 (Tex.Crim.App. 1989) (escape or attempted escape). The record in this case supports the trial court's determination that the probative value of the

---

3. All references to rules are to the Texas Rules of Criminal Evidence unless otherwise provided.

4. Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is

substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

evidence was not substantially outweighed by the danger of unfair prejudice. The trial court did not abuse its discretion in so holding. Point of error three is overruled.

### b. The stolen car and gun

In point of error six, appellant complains that testimony concerning a stolen automobile and gun constituted evidence of an extraneous offense, inadmissible under Rule 404(b). Testimony revealed that the victim was a gun dealer. When appellant was arrested at his home, the police recovered two guns, a .44 Ruger and a Tec Nine, from his bedroom. Fired projectiles found at the crime scene matched the .44 Ruger. The serial number from the Tec Nine was traced to the victim as a gun registered to him. Outside the presence of the jury, appellant objected to the testimony, claiming that its probative value was substantially outweighed by its prejudicial effect, and that the evidence had no probative value. In front of the jury, the State questioned Isaac Johnson, one of appellant's accomplices, as follows regarding the events on the day of the offense:

Q. Mr. Ransom went inside? Did he come back outside again?

A. Yes, sir.

Q. And did he have anything with him?

A. Yes, sir.

Q. What did he have?

A. A .44 Ruger.

Q. A .44 Ruger?

A. Yes.

Q. .44, meaning caliber?

A. Yes, sir.

Q. Had you seen that gun before?

A. Yes, sir.

Q. When had you seen the gun before that occasion?

A. Probably about a month or two before this had happened.

Q. Okay. And did the Defendant tell you where he had gotten that gun?

A. Yes, sir.

DEFENSE COUNSEL: Objection, hearsay, and the previously stated objections.

THE COURT: Overruled.

Q. Did the Defendant tell you how he got that gun?

A. Yes, sir.

Q. Where did he get the gun from?

A. He had told me that he had stole this lady's car, and he got it out of this gym bag in the back seat floor, on the floor of the car.

Johnson later testified that he, appellant, and two other men robbed the victim of several Tec Nines. Johnson further testified that he saw appellant shoot the victim.

Before Johnson's testimony and outside the presence of the jury, appellant's counsel had argued that where the gun came from was not probative of whether appellant used it as the murder weapon. The prosecutor responded that the extraneous offense incident tended to prove appellant's ownership of the gun and that such ownership connected appellant to the crime because the gun was the murder weapon. The prosecutor pointed out that defense counsel had cross-examined police officers concerning other guns found in the victim's car after the shooting. The prosecutor contended that such testimony could imply that the .44 Ruger was one of the guns owned by the victim.

Appellant argues that it was never disputed that he owned the Ruger. Appellant's theory at trial was that although he owned the gun, he had lent it to his accomplice. However, at the time the evidence of the burglary was introduced, appellant's defensive theory had not been presented. Furthermore, had there been other evidence to establish ownership of the gun, that fact does not speak to relevance under R. 404(b), but to probative value versus prejudicial impact under R. 403. See, *Montgomery*, 810 S.W.2d at 390.

It is the trial court's task to determine whether extraneous offense evidence is relevant to a non-propensity purpose; the trial court's ruling is entitled to deference and will be reversed only for abuse of discretion. *Montgomery*, 810 S.W.2d at 391. In the present case, the trial court was within its discretion in concluding that the testimony tended to show appellant's ownership of the .44 Ruger before the murder, thus con-

necting him to the murder. The fact that appellant stole the gun links him somewhat more strongly to the gun than mere possession would, as it implies purported ownership rather than incidental control. Further, extraneous offenses are admissible to rebut defensive theories raised by the testimony of a State's witness during cross-examination. *Crank v. State,* 761 S.W.2d 328, 341 (Tex. Crim.App.1988), *cert. denied,* 493 U.S. 874, 110 S.Ct. 209, 107 L.Ed.2d 162 (1989). The trial court could reasonably have believed that the cross-examination testimony about other guns found in the victim's car raised the inference that defendant did not own the .44 Ruger. Point of error six is overruled.

In point of error seven, appellant contends that the admission of testimony concerning the stolen car and gun was error under Rule 403 because its probative value was substantially outweighed by its prejudicial effect. Appellant argues that the probative value of the gun was minimal because ownership was not contested and that the prejudicial effect was great because the murder offense and the extraneous offense both involved the theft of guns. While the evidence showed that appellant possessed and admitted ownership of the .44 Ruger after the murder, at the time it was recovered by the police, the trial court could reasonably have concluded that the question of appellant's ownership of the gun at the time of the murder was still in dispute. Moreover, the extraneous offense is of a character that pales in comparison to the primary offense. The trial court was justified in concluding that the jury would not be swayed to convict appellant of capital murder on the basis of the comparatively minor offense of burglary of a motor vehicle. We do not believe that the trial court abused its discretion in finding that the prejudicial effect of the extraneous offense did not substantially outweigh its probative value. Point of error seven is overruled.

### 5. Discovery objection

In point of error five, appellant contends that the trial court should have excluded the testimony of accomplice Isaac Johnson altogether because the prosecution did not reveal a "deal" made with Johnson until immediately before his testimony. Appellant had previously filed a motion for discovery which was granted by the trial court. Appellant claims that the failure to disclose the agreement violated the trial court's discovery order.

The State agreed not to seek the death penalty against Johnson in exchange for his testimony at trial. The trial court found that the State's offer of leniency was made on the same day that Johnson was called to testify. The details of the agreement were presented to the jury, and appellant's attorney cross-examined Johnson regarding the deal.

This point is governed by our recent opinion in *Etheridge v. State,* 903 S.W.2d 1 (Tex. Crim.App.1994) *cert. denied,* —— U.S. ——, 116 S.Ct. 314, 133 L.Ed.2d 217 (1995). In that case, the defendant complained that the State did not disclose until the day of testimony that one of its witnesses had a prior conviction. *Etheridge,* 903 S.W.2d at 17. The State did not learn about the conviction until the morning of testimony, and the conviction was used to impeach the witness in front of the jury. *Id.* We held that, due to the availability and use of the prior conviction to impeach the witness at trial, there was no reasonable probability that the result of the trial would have been different had the existence of the prior conviction been disclosed earlier and that the trial court did not abuse its discretion in permitting the witness to testify. *Id.* As in *Etheridge,* the present case involves impeachment evidence that was unknown by the State until the time of trial, was disclosed to the defense, and was presented the jury. Point of error five is overruled.

### 6. Jury charge

In point of error eleven, appellant argues that the trial court erred in overruling his objection to the inclusion of a "parties" section in the jury charge. Appellant contends that the evidence of guilt showed him guilty only as the primary actor and that there was no evidence showing him to be guilty merely as a party.

When the evidence is sufficient to support both primary and party theories of liability, the trial court does not err in submitting an instruction on the law of parties. *Webb v. State,* 760 S.W.2d 263, 267 & 267 n. 7 & 275 (Tex.Crim.App.1988), *cert. denied,* 491 U.S. 910, 109 S.Ct. 3202, 105 L.Ed.2d 709 (1989). *See also Tucker v. State,* 771 S.W.2d 523, 529 (Tex.Crim.App.1988), *cert. denied,* 492 U.S. 912, 109 S.Ct. 3230, 106 L.Ed.2d 578 (1989). Evidence is sufficient to convict under the law of parties where the defendant is physically present at the commission of the offense and encourages its commission by words or other agreement. *Cordova v. State,* 698 S.W.2d 107, 111 (Tex.Crim.App.1985), *cert. denied,* 476 U.S. 1101, 106 S.Ct. 1942, 90 L.Ed.2d 352 (1986). "In determining whether the accused participated as a party, the court may look to events occurring before, during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Id.* Further, circumstantial evidence may be used to prove party status. *Id.*

The evidence indicated that there were four men involved in the robbery. While Johnson testified that he saw appellant shoot the victim, a rational jury could have disbelieved that testimony and harbored a reasonable doubt as to which of the four robbers was the actual shooter. Even if the jury held such doubts, the evidence was nevertheless sufficient to connect appellant to the offense as a party. Johnson testified that appellant agreed to a robbery scheme, recruited a friend to become part of that scheme, was present at the crime scene, was armed, and fired shots at the neighbors as the robbers left the scene after the murder. The .44 Ruger found in appellant's bedroom and admittedly owned by appellant matched a bullet found in the victim's garage and one found at a neighbor's house. A Tec Nine owned by the victim was also found in appellant's bedroom. Two non-accomplice witnesses, Oran Moore and Dwayne Kinney, testified that they saw appellant in the company of Johnson shortly before the offense was committed. The evidence was sufficient to show that appellant was present at the crime scene and aided the commission of the robbery-murder. The trial court was justified in submitting a parties instruction. Point of error eleven is overruled.

In point of error twelve, appellant complains that the parties charge did not limit the parties instruction to the particular facts of the case. The relevant portions of the charge are as follows:

> All persons are parties to an offense who are guilty of acting together in the commission of the offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for whom he is criminally responsible, or by both.

> A person is criminally responsible for an offense committed by the conduct of another *if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.* Mere presence alone will not constitute a party to an offense.

> .    .    .    .    .

> *If you find from the evidence* beyond a reasonable doubt that on or about the 7th day of December 1991, in Tarrant County, Texas, *Isaac Johnson, or Nathan Clark, or Bryan Williams did then and there intentionally cause the death of an individual,* Herbert Primm, by shooting him with a deadly weapon, to-wit: a firearm, and that said Isaac Johnson, or Nathan Clark, or Bryan Williams was then and there in the course of committing or attempting to commit the offense of robbery of Herbert Primm, *and that the Defendant, acting with the intent to promote or assist the commission of the offense of capital murder committed by Isaac Johnson, or Nathan Clark, or Bryan Williams, solicited, encouraged, directed, aided, or attempted to aid the said Isaac Johnson, or Nathan Clark, or Bryan Williams to commit the said offense,* if any, then you will find the Defendant guilty of capital murder as charged in the indictment.

(Emphasis given by appellant).

Relying upon *Johnson v. State,* 739 S.W.2d 299 (Tex.Crim.App.1987), appellant contends

that the instruction erroneously "fails sufficiently to inform the jury which specific mode or modes of conduct enumerated in Texas Penal Code § 7.02(a)(2) ... may form an alternative basis for conviction." *Id.* at 305 n. 4. While the charge permitted conviction on all possible theories of party liability (i.e. "solicited, encouraged, directed, aided, or attempted to aid"), appellant claims that not all of these theories are supported by the evidence. Assuming *arguendo* that this claim is correct, *Johnson* is nevertheless distinguishable from the present case. In *Johnson*, the issue was raised by a timely and specific objection, *id.* at 305, but in the present case, appellant made no objection at trial. Appellant argues that he has suffered "egregious harm," but we have rejected that argument where the application paragraph of the charge merely referred to the general parties definition. *Chatman v. State,* 846 S.W.2d 329, 332 (Tex.Crim.App.1993). In *Chatman,* we held that such a general reference, while not surviving a specific objection requesting that the charge more explicitly apply the law of parties to the facts, was "not a total failure" in that regard, and hence, no fundamental error was shown. *Id.* The charge in the present case is actually more specific than the charge in *Chatman,* including the modes of liability within the application paragraph. Point of error twelve is overruled.

#### 7. Jury argument

In point of error thirteen, appellant argues that the trial court erred in failing to grant a mistrial after the prosecutor made a reference to a witness who did not testify. During jury argument, the prosecutor stated:

> The law says there must be something that tends to connect or link the Defendant to the offense besides the co-defendant's testimony. You've got the .44. You have got the Tec Nine. You've got Oran Moore. You have got Dwayne Kinney. *And you have Harvey Ray Jones. You have all of those. That tends to connect —*

(emphasis added). At this point, defense counsel objected that the reference to Harvey Ray Jones was outside the record because he did not testify. The trial court

sustained the objection and instructed the jury to disregard the statement. Appellant's motion for mistrial was denied.

For jury argument that improperly refers to matters outside the record, error is cured by an instruction to disregard unless the argument is manifestly improper or so extreme that an instruction will not cure the error. *Burks v. State,* 876 S.W.2d 877, 907 (Tex.Crim.App.1994) (references to stocking mask and ski mask cured by instruction to disregard). *Pyles v. State,* 755 S.W.2d 98, 117 (Tex.Crim.App.), *cert. denied,* 488 U.S. 986, 109 S.Ct. 543, 102 L.Ed.2d 573 (1988) (argument that no complaint had been lodged against prison worker cured by instruction to disregard). We do not believe that the mere reference to the name of a witness who did not testify is so improper or extreme that it cannot be cured by an instruction to disregard. Point of error thirteen is overruled.

We AFFIRM the conviction but VACATE the sentence and REMAND this cause for a new hearing on punishment in accordance with Art. 44.29(c).

OVERSTREET and MALONEY, JJ., dissent.

MANSFIELD, Judge, concurring.

I join the well-written and well-reasoned opinion of the Court. While I believe that *Garrett v. State,* 851 S.W.2d 853 (Tex.Crim. App.1993), was wrongfully decided, it is, unless and until overruled, the law. I agree that the majority's holding that *Garrett* error is "error affecting punishment only" is correct in light of the Supreme Court's holdings in *Witherspoon, Bumper, Wainwright,* and this Court's holdings in *Cuevas* and *Jones.*

CLINTON, Judge, dissenting on State's Motion for Rehearing.

On original submission in this cause, we reversed a capital conviction on the basis that the trial court erroneously granted a State's challenge for cause. The State premised its challenge for cause on the venireman's asserted unwillingness to answer the second punishment issue affirmatively based on nothing more than the facts of the capital

offense itself. We held that granting such a challenge for cause was error under *Garrett v. State*, 851 S.W.2d 853 (Tex.Cr.App.1993), and reversed the entire conviction. In a footnote we explained why it was not necessary to reach other points of error claiming error at the guilt phase of trial:

"We cannot say that in the case of an erroneously granted challenge for cause that it 'affect[ed] punishment only', even though the challenge was based on a punishment issue. This is because the erroneous elimination of a venireperson conceivably affects the composition of the jury, which sits at both guilt and punishment."

Majority op. at 294, n. 5. That is to say, error of any kind at the voir dire stage of trial is error that by its very nature "affects" more than just the punishment assessed.

The State Prosecuting Attorney has filed a stout motion for rehearing, attacking our construction of Article 44.29(c), supra. He argues that the erroneous exclusion of a venireman on the basis of a purported inability to follow some aspect of the law applicable only to the punishment phase of a capital trial is "error affecting punishment only" in contemplation of the statute. He points to the fact that exclusion of veniremen on the basis of conscientious scruples against the death penalty, without more, in violation of the Sixth Amendment to the United States Constitution, does not wholly vitiate a capital conviction, but only the sentence of death. See *Witherspoon v. Illinois*, 391 U.S. 510, 516–17, 88 S.Ct. 1770, 1774–75, 20 L.Ed.2d 776, 782 (1968); *Bumper v. North Carolina*, 391 U.S. 543, 545, 88 S.Ct. 1788, 1790, 20 L.Ed.2d 797, 800–801 (1968); see also *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Accordingly, in capital cases in which punishment less than death was assessed, the Court has rejected the contention that exclusion of veniremen for nothing more than harboring conscientious scruples against the death penalty called for reversal of the conviction. E.g., *Parks v. State*, 437 S.W.2d 554, 557–58 (Tex.Cr.App.1969); *Bradley v. State*, 450 S.W.2d 847, 849–850 (Tex.Cr.App.1969). Moreover, even in capital cases in which the death penalty has been assessed, the only reason the Court has not remanded those cases for reassessment of punishment in the past has been a perceived lack of authority from the Legislature to do so. *Ellison v. State*, 432 S.W.2d 955, 957 (Tex.Cr.App.1968).

In *Ellison* we held that the trial court erred to grant State's challenges for cause in violation of *Witherspoon v. Illinois*, supra. In addressing the proper disposition of the cause in light of that error, the Court observed:

"As we understand the opinion of the Supreme Court in *Witherspoon v. Illinois*, supra, in its role as arbiter of the punishment to be imposed, appellant's jury 'fell woefully short' of that impartiality to which he was entitled under the Sixth and Fourteenth Amendments but, as to the guilt or innocence issue, bias with respect to appellant's guilt is not shown.

"The Texas Statute provides for a separate hearing on proper punishment before the same jury and provides that where the matter of punishment is referred to the jury, the verdict shall not be complete until the jury has rendered a verdict both on the guilt or innocence of the defendant and the amount of punishment when the jury finds the defendant guilty. And in the event the jury shall fail to agree, a mistrial shall be declared, the jury discharged and no jeopardy shall attach. Art. 37.07 V.A.C.C.P. [Footnote omitted.]

"Our statute provides that the Court of Criminal Appeals may affirm the judgment of the court below, or may reverse and remand for a new trial, or may reverse and dismiss the case, or may reform and correct the judgment as the law and nature of the case may require. Art. 44.24 V.A.C.C.P.

"Also, Art 44.29 V.A.C.C.P. provides: 'Where the Court of Criminal Appeals awards a new trial to the defendant, the cause shall stand as it would have stood in case the new trial had been granted by the court below.'

"It follows that this court is without authority to direct a new trial before a different jury on the issue of punishment only."

Since *Ellison,* of course, Article 44.29 has been amended. It now provides, in subsection (c), that:

"[i]f any court sets aside or invalidates the sentence of a defendant convicted of an offense under Section 19.03, Penal Code, and sentenced to death on the basis of any error affecting punishment only, the court shall not set the conviction aside but rather shall commence a new punishment hearing under Article 37.071 or Article 37.011 of this code, as appropriate, as if a finding of guilt had been returned."

The State Prosecuting Attorney contends that by adding subsection (c), the Legislature has now authorized this Court, as it was not authorized at the time of *Ellison,* to remand solely for a new punishment hearing any sentence invalidated for "error affecting punishment only." He contends granting a State's challenge for cause that is invalid under *Witherspoon* and its progeny constitutes just such an error.

In support of this argument the State Prosecuting Attorney invites us to contrast the language of subsection (c) with that of the immediately preceding subsection, Article 44.29(b). That provision authorizes remand only for a new punishment proceeding in any non-capital case that is reversed "only on the basis of an error or errors made in the punishment stage of the trial[.]" This language from subsection (b) clearly does not apply to voir dire error, since voir dire error is not "made in the punishment stage" of trial. But, the argument goes, error during the voir dire, though it does not occur "in the punishment stage," may yet "affect[ ] punishment only[.]" Thus, remand only for a new punishment hearing would be the proper course in a capital case under subsection (c). The State Prosecuting Attorney argues that this change in language from subsection (b) to subsection (c) was specifically intended to cover *Witherspoon* error.

To these arguments of the State Prosecuting Attorney I would add one more. On original submission we reversed partly on the strength of our opinion in *Grijalva v. State,* 614 S.W.2d 420 (Tex.Cr.App.1980). In *Gri-*

jalva the Court held that any inquiry as to error in granting a State's challenge for cause in violation of *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980) could not be obviated by the fact that at the conclusion of voir dire the State had remaining peremptory challenges. But even in *Grijalva* itself, we characterized *Adams* error as "error [that] affects only the death penalty[.]" 614 S.W.2d at 425. If its goal was, as the State Prosecuting Attorney contends, expressly to authorize only a remand for a new punishment hearing whenever the only error in a capital murder trial is *Adams/Witherspoon* error committed during voir dire, the Legislature could hardly have chosen more appropriate language to effectuate that goal. Given the characterization in *Grijalva,* it seems indisputable that whatever Article 44.29(c) means by "error affecting punishment only," we must construe it to embrace error in granting a State's challenge for cause on the basis of an inability to follow some phase of the law that has application only to punishment phase issues. *Garrett* error is of this kind.*

For all these reasons I agree with the majority today that we were not at liberty on original submission to reverse the judgment of conviction without first assaying points alleging error at the guilt phase of trial. The majority therefore correctly proceeds to the merits of appellant's guilt phase points of error. Nevertheless the majority errs, in my view, in failing to sustain, if not his sixth point of error, then at least his seventh. In his sixth point of error appellant claims the trial court erred in admitting evidence of extraneous misconduct for nothing more than its character conformity value, in violation of Tex.R.Cr.Evid., Rule 404(b). In his seventh point of error he argues that the probative value of that evidence, if any apart from character conformity, was substantially outweighed by the danger of unfair prejudice, and therefore should have been excluded under Tex.R.Cr.Evid., Rule 403.

Police investigators found the murder weapon, a .44 Ruger, in appellant's possession upon his arrest. As I understand it, the

---

* It should be noted that when *Garrett* itself was decided, the Legislature had not yet amended Article 44.29(c) to read as it does in its present form.

State's theory of admissibility of testimony that appellant came to possess the Ruger as a result of a prior offense is that it was necessary to show he "owned" the weapon at some time before the instant offense so that the jury would not mistakenly conclude it had belonged to the victim himself, who was a gun dealer. Apparently the State's concern was that if the Ruger was taken from the victim's possession at the time of the offense, it might have been one of appellant's accomplices rather than appellant himself who actually pulled the trigger; and it is not enough to refute that possibility that the gun was later recovered in appellant's bedroom. Even accepting the legitimacy of this theory, it was not necessary to show *how* appellant came to possess the Ruger prior to the instant offense. As counsel for appellant pointed out at trial, it would have served the purpose to show through accomplice Johnson's testimony the simple fact that appellant did in fact possess the gun at an earlier time. There was no need to prove he found it in a gym bag in a car he had stolen. See majority op. at 300. This amounts to nothing more than evidence appellant is a criminal in general, inviting the jury to reason, contrary to Rule 404(b), that he was guilty of the offense charged because that conclusion would be consistent with his criminal character.

Moreover, even if proof that the murder weapon that appellant possessed at some point prior to the crime was in fact stolen *did* somehow serve incrementally to strengthen the inference that he was the triggerman, the contribution of that evidence would be so marginal as to approach insignificance. The potential for unfair prejudice—that the jury would consider the evidence purely for its character conformity value—would substantially outweigh its probative value; so much so that I would declare that no reasonable trial court could refuse to exclude it, upon request, under Rule 403, even affording the trial court the degree of deference that *Montgomery v. State*, 810 S.W.2d 372, at 391–393 (Tex.Cr.App.1991) (Opinion on rehearing), calls for. Counsel for appellant *more than adequately preserved* both the relevance complaint and the Rule 403 complaint for appeal, and in my view the trial court erred to admit the complained-of testimony.

The State contends that any error in admitting the extraneous misconduct was harmless beyond a reasonable doubt, and hence Tex.R.App.Pro., Rule 81(b)(2) does not require us to reverse the conviction. I disagree. The State's case was predicated largely upon the testimony of an accomplice, Isaac Johnson, who was the only witness who positively placed appellant at the scene of the shooting, and testified appellant himself was the shooter. At least one other witness testified that he saw appellant earlier in the evening in Johnson's company, and that appellant was carrying a gun that looked like the Ruger. Thus, there was other evidence to connect appellant to the offense, and appellant does not contend the evidence failed to corroborate the accomplice's testimony, as required by Article 38.14, V.A.C.C.P. But appellant presented alibi testimony from two of his siblings, a twenty-one year old sister and a ten year old brother. Each maintained that on the evening of the killing, Johnson had come by their house to borrow the Ruger, which appellant kept on the premises for protection in a rough neighborhood. Appellant did not go with Johnson, but stayed home that night. Early the next morning, according to appellant's sister, Johnson returned the gun. These witnesses had an obvious bias, and the sister's testimony was impeached; but their credibility was no more inherently suspect than Johnson's. Under these circumstances I cannot discount the possibility that the prejudice engendered by showing appellant obtained the Ruger by illegal means contributed to the conviction. A jury having to choose whether to believe Johnson over appellant's siblings may well have been unfairly influenced by the fact that appellant had previously committed another criminal act. I, for one, cannot conclude to a level of confidence beyond a reasonable doubt that admission of the extraneous offense did not contribute to appellant's conviction.

Thus I believe reversible error occurred at both the guilt and punishment phases of trial. For this reason we should reverse the judgment of the trial court and remand the cause

for a whole new trial, albeit this time pursuant to Article 44.29(a), V.A.C.C.P., rather than Article 44.29(c). Because the Court does not, I dissent.

BAIRD, Judge, dissenting on State's Motion for Rehearing.

On original submission appellant's conviction was reversed for *Garrett* error [1] and this case was remanded to the trial court. *Ransom v. State,* 920 S.W.2d 288 (Tex.Cr.App. No. 71,633, delivered June 15, 1994). At that time, we considered whether the case should be remanded for an entirely new trial or remanded for a new punishment hearing under Tex.Code Crim.Proc.Ann. art. 44.29(c). That article provides:

> If any court sets aside or invalidates the sentence of a defendant convicted of an offense under Section 19.03, Penal Code, and sentenced to death on the basis of any *error affecting punishment only,* the court shall not set the conviction aside but rather shall commence a new punishment hearing under Article 37.071 or Article 37.0711 of this code, as appropriate, as if a finding of guilt had been returned.[2]

We determined the case should be remanded for a new trial, reasoning:

> ... The question ... is whether the State's erroneously granted challenge for cause "affects punishment only". We conclude it does not. We note initially that article 44.29(c) does not set forth a "harmless error test". Therefore, we do not need to decide whether the error contributed to the conviction or the punishment, but merely whether the error was one "*affecting* punishment only". We cannot say that in the case of an erroneously granted challenge for cause that it "affected punishment only", even though the chal-

lenge was based on a punishment issue. This is because the erroneous elimination of a venireperson conceivably affects the composition of the jury, which sits at both guilt and punishment.

*Ante* at 294, fn. 5 (emphasis in original). The sole issue before us is whether *Garrett* error affects punishment only.[3]

## I. Types of Error

Error is classified as either trial error or structural error. *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). In *Fulminante,* the United States Supreme Court discussed the differences between these two types of error. The Court held structural errors are those which affect the framework within which the trial proceeds rather than simply an error in the trial process itself. *Id.* 499 U.S. at 310, 111 S.Ct. at 1265. The Court noted several structural defects: the deprivation of the right to counsel at trial, *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); the denial of the right of self-representation, *McKaskle v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984); the denial of an impartial judge, *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); the unlawful exclusion of members of the defendant's race from a grand jury, *Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986); the denial of a public trial, *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). These cases represent structural defects which defy analysis by harmless-error standards, and require an entirely new trial. *Fulminante,* 499 U.S. at 309, 111 S.Ct. at 1265.

This Court has acknowledged that certain errors are not subject to a harm analysis under Tex.R.App.P. 81(b)(2).[4] *See, Marin v.*

---

1. *See, Garrett v. State,* 851 S.W.2d 853 (Tex.Cr. App.1993).

2. All emphasis is supplied unless otherwise indicated.

3. The State argues in its Motion for Rehearing that any possible voir dire error was nullified by the State's *remaining peremptory challenges* which it *could have used* to remove any troublesome veniremembers. This argument was correctly rejected by the Court on original submis-

sion on the basis of *Grijalva v. State,* 614 S.W.2d 420 (Tex.Cr.App.1980). *Ante* at 292.

4. Tex.R.App.P. 81(b)(2) provides:

> If the appellate record in a criminal case reveals error in the proceedings below, the appellate court *shall* reverse the judgment under review, *unless* the appellate court determines beyond a reasonable doubt that the error *made no contribution* to the conviction or to the punishment.

*State,* 851 S.W.2d 275, 281 (Tex.Cr.App.1993). For example, the denial of a request for ten days to respond to an amended indictment is not subject to a harm analysis. *Sodipo v. State,* 815 S.W.2d 551 (Tex.Cr.App.1990). This is so because,

> ... the ten day requirement found in [Tex. Code Crim.Proc.Ann. art.] 28.10(a) cannot be subjected to a harm analysis in any meaningful manner, because the record will not reveal any concrete data from which an appellate court can meaningfully gauge or quantify the effect of the error.

*Sodipo,* 815 S.W.2d at 554 (opinion on original submission). And, we have held other errors defy a meaningful harm analysis. *See e.g., Rey v. State,* 897 S.W.2d 333, 345 (Tex. Cr.App.1995); *Turner v. State,* 897 S.W.2d 786 (Tex.Cr.App.1995); *Smith v. State,* 648 S.W.2d 695 (Tex.Cr.App.1983).

On the other hand, trial error is error which occurs during the presentation of the case to the jury. *Fulminante,* 499 U.S. at 307, 111 S.Ct. at 1264. Trial error *is* subject to a harmless error analysis because it may be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt. *Ibid.* The *Fulminante* Court recognized most errors are subject to a harm analysis, even errors of constitutional magnitude. *Fulminante,* 499 U.S. at 306–307, 111 S.Ct. at 1263 (admission of coerced confession subject to harmless error analysis); *Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) (unconstitutionally overbroad jury instructions can be harmless); *Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988) (admission of evidence in violation of the Sixth Amendment Counsel Clause subject to harm analysis); *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431,

89 L.Ed.2d 674 (1986) (restriction on a defendant's right to cross-examine a witness for bias in violation of the Sixth Amendment Confrontation Clause); *Carella v. California,* 491 U.S. 263, 109 S.Ct. 2419, 105 L.Ed.2d 218 (1989) (jury instruction containing an erroneous conclusive presumption); *and, Pope v. Illinois,* 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987) (jury instruction misstating an element of the offense). "The common thread connecting these cases is that each involved 'trial error'—error which occurred *during the presentation of the case to the jury,* and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Fulminante,* 499 U.S. at 307–308, 111 S.Ct. at 1263–64. *See also, Harris v. State,* 790 S.W.2d 568, 584–588 (Tex.Cr.App.1989).

From this discussion, it follows that, in the context of art. 44.29(c), error "affecting punishment only" is trial error which occurs at the punishment phase of a capital trial and results in only a partial reversal.[5] By the same token, error affecting punishment only can *not* be structural error because structural error affects the framework of the trial and requires an entirely new trial. Having said this, we must now determine if *Garrett* error is trial error or structural error.

## II. *Garrett* Error

*Garrett* dealt with error which occurred during voir dire. We held a veniremember is not subject to being challenged for cause merely because he indicates he would require more evidence than the legal minimum to affirmatively answer the punishment issue regarding future dangerousness. *Garrett v. State,* 851 S.W.2d 853, 860 (Tex.Cr.App.1993). *See also, Castillo v. State,* 913 S.W.2d 529

---

The federal harmless error standard was established in *Fahy v. Connecticut,* 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963): "Whether there is a reasonable probability that the evidence complained of might have contributed to the conviction," and the common law rule which placed on the beneficiary of the error the burden of proving that no injury was suffered as a result of the error. *See also, Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967):

> ... before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.

5. This reading is consistent with art. 44.29(b) which deals with a reversal "on the basis of an error or errors made *in the punishment stage of the trial.*"

(Tex.Cr.App.1995). Each juror must define beyond a reasonable doubt for themselves. A particular juror's understanding of proof beyond a reasonable doubt may lead him to require more than the legal threshold of sufficient evidence to affirmatively answer the future dangerousness issue. *Garrett*, 851 S.W.2d at 859. Consequently, a juror *may*, but is not required to, find future dangerousness on the facts of the offense alone. And, a venireperson who indicates he would set his reasonable doubt threshold higher than the legal minimum has not evinced a bias or prejudice against the law upon which the State is entitled to rely. *Id.*, 851 S.W.2d at 860.

Although *Garrett* dealt with a juror's thoughts and feelings pertinent to a punishment issue at a capital trial, the error *did not* occur at the punishment phase of the trial. In two similar cases, we treated this type of error as a structural error. In *Powell v. State*, 631 S.W.2d 169 (Tex.Cr.App.1982), the defendant pled guilty and attempted to voir dire veniremembers to determine their feelings on the differing theories of punishment. We held the topic was proper for voir dire and, therefore, it was an abuse of discretion for the trial judge to prevent the defendant from asking the question. We reversed and remanded for a new trial. *Id.*, 631 S.W.2d at 170. Furthermore, in *Campbell v. State*, the defendant pled guilty and attempted to voir dire the veniremembers on the theories of punishment. The trial judge prohibited the questioning which the Court of Appeals re-

versed and remanded, and we affirmed. *Id.*, 667 S.W.2d 221 (Tex.App.—Dallas 1983), *and*, 685 S.W.2d 23 (Tex.Cr.App.1985).

In these cases harm was presumed because the failure to allow a proper question denied the defendant the intelligent use of his peremptory strikes and, therefore, required a new trial. *Smith v. State*, 703 S.W.2d 641 (Tex.Cr.App.1985); *and*, *Mathis v. State*, 576 S.W.2d 835 (Tex.Cr.App.1979). Although those cases were decided before the adoption of Rule 81(b)(2), in *Nunfio v. State*, 808 S.W.2d 482 (Tex.Cr.App.1991), we unanimously held such error is not subject to a harm analysis under Rule 81(b)(2). *Nunfio*, 808 S.W.2d at 485. Because this type of error is not subject to a harm analysis, it is necessarily structural error.[6]

Moreover, it is structural error because it does *not* fall within *Fulminante's* definition of trial error. *Id.*, 499 U.S. at 307, 111 S.Ct. at 1264. First, the error does not occur during the presentation of the case to the jury, instead, it occurs *before* a jury is empaneled and sworn. Second, the error does not occur at a time when its harm may be quantitatively assessed. There is no means of quantifying the harm because the veniremember is prohibited from serving on the jury. Because the veniremember has been excluded from the jury, the record will not reveal any concrete data from which an appellate court can meaningfully gauge or quantify the effect of the error. *Sodipo*, 815 S.W.2d at 554.[7]

---

6. The majority correctly notes that not all voir dire error requires reversal. However, those cases where we have characterized such error as *harmless* deal with an improper limitation of the defendant's voir dire where the limitation was later *cured*. *See e.g., Dinkins v. State*, 894 S.W.2d 330, 345 (Tex.Cr.App.1995) (error limiting voir dire of 53rd venireman cured when jury selection concluded with 45th veniremember); *Wheatfall v. State*, 882 S.W.2d 829, 844 (Tex.Cr.App.1994) (error limiting voir dire cured when veniremember eventually permitted to answer the question) (Baird, J., concurring); *Santana v. State*, 714 S.W.2d 1, 10 (Tex.Cr.App.1986) (error limiting voir dire on lesser included offense cured when evidence did not raise and trial judge did not charge on lesser offense). However, in situations, like the instant case, where the error results in the excusal of a veniremember for cause at the State's request, there is no harm analysis. *Grijalva*, 614 S.W.2d at 420. Consequently, the

majority's reliance on *Jones v. State*, 843 S.W.2d 487 (Tex.Cr.App.1992), is misplaced.

7. In this regard the majority holds that *Garrett* error is error affecting punishment only, "unless the defendant produces evidence showing that the error necessarily produced a jury biased against the defendant on the issue of guilt." *Ante* at 298. This is an impossible burden for at least two reasons. First, *Garrett* error prohibits the veniremember's service on the jury. Consequently, it will be impossible to show what the veniremember's verdict would have been or how the veniremember would have interacted with the other jurors and what effect, if any, that interaction would have had on the remaining jurors. Secondly, in order for a defendant to show a biased jury, he would necessarily have to inquire into the jury's verdict. Such an inquiry is prohibited by Tex.R.Crim.Evid. 606(b).

### III. The Majority's Analysis

The majority's holding that *Garrett* error is error affecting punishment only is premised upon a flawed interpretation of several of our cases dealing with *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). In those cases, *Garcia, Sanne, Phelps,* and *White,* we did not address the points of error alleging violations of *Witherspoon* because those defendants received life sentences.[8] Based upon those cases, the majority reasons:

> . . . it follows then that *Witherspoon* error relates only to punishment. And since *Witherspoon* error relates only to punishment, it further follows that death sentences in trials in which *Witherspoon* error occurred need only be reversed and remanded for a new punishment determination rather than a new trial on guilt.

*Ante* at 297.

Reliance on those cases is misplaced for at least two reasons. First, *Garrett* error is *not* akin to *Witherspoon* error and we have so stated. *Garrett,* 851 S.W.2d at 860, n. 5. In spite of our express statement to the contrary, the majority states: "*Witherspoon* and *Garrett,* are, in respects relevant to the present case, indistinguishable." *Ante* at 297. This simply is not so.

Secondly, in the capital murder cases where life sentences were imposed, the possibility existed that the trial judge violated *Witherspoon* in excluding, from the jury, veniremembers who had conscientious or religious scruples against the death penalty but who could set aside those feelings and truthfully answer the punishment issues based on the law and the evidence. These alleged errors had the potential of producing a jury "uncommonly willing to condemn a man to die." *Witherspoon,* 391 U.S. at 521, 88 S.Ct. at 1776. However, that potential was not realized if the sentence ultimately imposed was *not* death. In other words, a life sentence renders the *Witherspoon* allegations moot. Consequently, in those cases we held: "*Witherspoon* has no application where the death penalty is *not* imposed." *See, White,* 591 S.W.2d at 858.

However, in the instant case, and our other cases dealing with *Garrett* error, the death penalty was imposed. Consequently, any error that led to the exclusion of a veniremember from serving on the jury affected the composition of the jury that determined guilt as well as punishment. In this setting, *Garrett* error has special significance because it results in the exclusion of a veniremember who had an understanding of beyond a reasonable doubt higher than the legal minimum. This is significant because that quantum of proof applies at both the guilt/innocence and punishment phases. Consequently, if a juror's understanding of reasonable doubt is greater than the legal minimum at punishment, it is also greater at guilt/innocence. Striking veniremembers who maintains this higher standard for punishment also removes them from the determination of guilt. Therefore, *Garrett* error affects the guilt determination and is not error affecting punishment only. The Eastland Court of Appeals recognized this in *Purtell v. State,* 910 S.W.2d 145, 146–47 (Tex. App.—Eastland, 1995).

### IV. Conclusion

Although *Garrett* error involves a punishment issue, it is not error affecting punishment only. Rather, *Garrett* error is structural error which pollutes the integrity of the trial process at its source, the jury. Because it is structural error, an entirely new trial is required. Accordingly, the State's motion for rehearing should be overruled and our opinion on original submission should be affirmed.

---

8. *See, Garcia v. State,* 626 S.W.2d 46 (Tex.Cr. App.1981); *Sanne v. State,* 609 S.W.2d 762 (Tex. Cr.App.1980); *Phelps v. State,* 594 S.W.2d 434 (Tex.Cr.App.1980); *and, White v. State,* 591 S.W.2d 851 (Tex.Cr.App.1979).

*Sanne* dealt with a retrial. At the first trial, the jury returned a negative answer to one of the punishment issues and punishment was assessed at confinement for life. At the retrial, the jury answered the punishment issues in the affirmative and death was assessed. We held that having received a favorable punishment verdict at his first trial, Sanne was not death eligible on retrial. *Id.,* 609 S.W.2d at 766.

With these comments, I respectfully dissent.