In The



Court of Appeals



Ninth District of Texas at Beaumont


____________________



NO. 09-07-588 CR


____________________



ARTURO GOMEZ RIVERA, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 411th District Court


Polk County, Texas


Trial Cause No. 18,908






OPINION



 A jury convicted appellant Arturo Gomez Rivera of two counts of aggravated sexual
assault of a child, and the trial court sentenced Rivera to twenty years of confinement for
count one and fifteen years of confinement for count two, with the terms to run
consecutively. Rivera filed this appeal, in which he raises two issues concerning the
admission of evidence about his previous sexual misconduct involving a minor. See Tex. R.
Evid. 403, 404(b). Because we find that the trial court did not abuse its discretion by
determining that the challenged evidence was admissible to rebut defensive theories raised
during opening statement, and that the evidence's probative value outweighed the danger of
unfair prejudice, we affirm.

Background


Opening Statements


 In his opening statement, defense counsel suggested to the jury several bases for
challenging the credibility of the victim ("Doe"), as well as an allegation of lack of
opportunity for Rivera to have committed the offenses. Defense counsel emphasized that
Doe's parents never noticed any physical or emotional problems with Doe during the period
of time in which the assaults allegedly occurred, and that Doe never seemed reluctant to have
contact with Rivera. Rivera's counsel also mentioned that the sexual assault nurse examiner
who examined Doe found no physical evidence of sexual assault. In addition, defense
counsel pointed out that many of the assaults allegedly occurred in the small mobile home
Rivera shared with three other individuals, and that none of those individuals saw or heard
Rivera do anything inappropriate with Doe. Moreover, defense counsel stated that Doe told
two people that Rivera did not sexually assault him. Furthermore, defense counsel argued
as follows:

 Ladies and gentlemen, there will also be testimony regarding a motive.
[M.G.], that's [Doe]'s mother, brought a baby illegally into the United States
from Mexico. The baby was not hers. Nevertheless, she secured a birth
certificate for the baby showing that the baby was hers and that the baby had
been born in the United States. [M.G.] knew that [Rivera] knew and that
[Rivera] disapproved.


Lastly, defense counsel told the jury that Rivera would testify that he never assaulted Doe or
acted inappropriately toward him, and that "the incidents described by [J.G.] never took
place."

Trial Testimony


 The victim's older brother, J.G., who was the State's second witness, testified that he
was ten years old when he met Rivera at church, and Rivera, who was a close friend of J.G.'s
family, began offering him Bible lessons at Rivera's home. J.G. explained that Rivera lived
in a trailer, which he shared with three other individuals. According to J.G., while he was
at Rivera's home, Rivera showed him adult magazines, and J.G. testified that Rivera "would
tell me that I had good legs and had a sexy butt and he would caress me on my ear and
everything, kiss me and stuff like that." J.G. also testified that Rivera rubbed his leg with his
hand, which made him feel uncomfortable, but he did not tell his parents because Rivera
threatened him. (1)

 According to J.G., Rivera showed him adult videos depicting "men having sex and
men and women having sex." In addition, J.G. testified that when he traveled in Rivera's car
to church activities, Rivera caressed his leg and kissed his ear. Rivera asked J.G. if he had
a girlfriend, and at the end of the conversation, Rivera told J.G. that he liked men. When J.G.
was twelve years old, he spent the night at Rivera's house while his parents were out of town,
and while he was sleeping, Rivera touched his stomach and attempted to grab his penis. J.G.
awakened and told Rivera to stop. The three other individuals who lived at Rivera's house
were all at home when the incident occurred. J.G. explained that when he reached
approximately seventeen years of age, Rivera stopped touching him. After J.G. moved away
from home, he eventually told his parents what had happened with Rivera because he did not
want the same thing to happen to his younger brother. Based upon the information J.G.
related to his father, his parents spoke with the victim and filed a report.

 Doe, who was fourteen years old at the time of the trial, testified that Rivera was a
family friend who lived nearby and attended the same church as Doe and his family. (2) At
around age ten, Doe began going to Rivera's house for Bible lessons. Doe testified that he
had also been in Rivera's car, and Rivera had taken him to a mall. When Doe was at
Rivera's house, Rivera sometimes showed him books and magazines that depicted "[g]irls
and girls and girls and men and men and girls." When Rivera showed Doe the books and
magazines, Rivera rubbed Doe's leg, kissed Doe on the lips, and asked Doe if he liked the
materials. Doe testified that this behavior happened many times. In addition, Doe testified
that Rivera wrote down web addresses for him so that Doe could access pornographic
materials on the internet.

 Doe testified that when he was ten years old, Rivera would take him to a dirt road,
turn off the car and lights, and kiss him. In addition, Doe testified that Rivera showed him
movies, some of which depicted sexual acts. Doe explained that he did not tell his parents
about Rivera's actions because Rivera threatened to punch him, and he was frightened of
Rivera.

 Doe testified that he sometimes spent the night at Rivera's house, and the first time
he did so, Rivera rubbed Doe's leg and kissed his lips. Doe testified that on other occasions
when he spent the night with Rivera, both at Rivera's home and at a hotel room out of town,
Rivera engaged in the acts of oral and anal penetration alleged in the indictment. Doe
explained that Rivera's house had only two bedrooms, and Rivera sometimes told Doe not
to make any noise because the other men who lived there were sleeping. Doe testified that
he never cried out, so the other people in the house never heard anything.

 After Doe's brother told his parents about what Rivera had done to him, Doe's parents
met with Rivera, and Doe then told his brother-in-law about what Rivera had been doing to
Doe. Doe testified that he feared that other children would make fun of him if they knew
about what happened, and he told some acquaintances from school that nothing had
happened. Doe eventually told his parents and a representative from the Texas Department
of Family and Protective Services ("DFPS") about what Rivera had done to him.

 Shawna Farrar, an investigator with the DFPS, testified that she interviewed Doe after
the Livingston Police Department requested that she do so. According to Farrar, Doe
reported numerous acts of sexual contact with Rivera, which occurred when Doe was
between eleven and thirteen years of age.

 Detective Matt Parrish of the Livingston Police Department testified that during the
course of investigating the case, he met with Doe's family and set up interviews with the
proper agencies. After DFPS completed its interview with Doe, Detective Parrish prepared
a complaint, and a warrant issued for Rivera's arrest. Patrol officers who arrived at Rivera's
residence to arrest him called Detective Parrish to the scene. Upon arriving at Rivera's
residence, Detective Parrish advised Rivera of his rights and obtained Rivera's permission
to search the residence. Detective Parrish searched the living area, bedroom, and bathroom
of Rivera's home, and he found two videotapes that depicted explicit homosexual acts
between adults, a Playboy magazine, a notebook, some photographs, cream, and partially
clothed dolls.

 Paula Armstrong, the district manager of Movie Gallery Video Stores, testified that
there are two Movie Gallery Video Stores in Livingston, and both stores rent adult videos. 
Armstrong explained that her company received a subpoena from the Polk County District
Attorney's office regarding any accounts held by Rivera. Armstrong testified that Rivera has
accounts at both of the Movie Gallery Video Stores in Livingston, and the records of
Rivera's account reveal that he rented 129 adult videos from one store and 53 adult videos
from the other store. Armstrong also testified that Rivera's account information indicated
that he purchased an adult video at one store and nine adult videos, as well as an adult
magazine, at the other location.

 Jesse Alaniz testified that he has known Rivera, Doe, and J.G. for a number of years,
and that he is one year younger than J.G. Alaniz testified that when he asked Doe about
whether something happened between Doe and Rivera, Doe said, "No. No. Nothing
happened." Alaniz also testified that he asked Doe the same question a second time, and Doe
responded in the same way. Alaniz further explained that when Rivera was arrested, Alaniz
served as an interpreter.

 M.G., Doe's mother, testified that Rivera taught Doe two days per week. M.G.
eventually learned that Doe said that Rivera had inserted his penis into Doe's anus. M.G.
explained that she never noticed anything physically or emotionally wrong with Doe. M.G.
testified that she adopted a child who was born in Mexico, but the child's birth certificate
indicates that M.G. gave birth to the child in Polk County. According to M.G., Rivera knew
about the child's origins from the beginning. After J.G. told M.G.'s husband what had
happened with Rivera, M.G. met with Doe and Rivera. According to M.G., each time she
would ask Doe if Rivera had done something to him, Rivera would not let Doe speak, and
Rivera encouraged Doe to say that Rivera was Doe's best friend.

 Ken Victory Hayes testified that he knows Rivera, Doe, and Doe's family. Hayes
hired Rivera to do maintenance work at a group of buildings Hayes owned. Doe worked with
Rivera at Hayes's property approximately three times, and Hayes testified that Doe never said
that Rivera had sexually assaulted him. Gordon Hayes testified that Rivera did some work
around his house, and Doe sometimes helped Rivera. According to Gordon, Doe never
complained about any molestation by Rivera, and he never saw Rivera act inappropriately
toward Doe.

 Daniel Rivera testified that he is thirteen years old, and he has known his uncle,
Arturo Rivera, for seven years. Daniel testified that he also knows Doe, who he met at
church. After learning that Rivera had been arrested, Daniel asked Doe at school if Rivera
had done anything to him, and Doe said that Rivera had not.

 Angel Aldalgo testified that he and two other individuals once lived with Rivera. 
According to Aldalgo, Doe visited frequently, and Doe never told him that Rivera had
molested him. Aldalgo further explained that he had never seen Rivera molest Doe, and he
denied seeing any pornographic magazines or videos at Rivera's residence. Aldalgo denied
ever hearing Rivera discuss Doe's parents' adopted child in a negative manner.

 Brenda Garrison, a sexual assault nurse examiner with Child Abuse and Forensic
Services in Beaumont testified that she examined Doe and prepared a report regarding the
results of the examination. Garrison testified that she found no evidence of physical trauma
upon examining Doe, but she indicated "sexual assault by history" in her report. Garrison
explained that she examined Doe on January 9, 2006, and since the last sexual assault of Doe
occurred in late October of 2005, two and a half months earlier, she would not expect to find
evidence of anal trauma or laxity.

 Rivera testified that he met Doe and his family at church, and he helped Doe and his
brother by teaching them to read Bible verses in Spanish. Rivera denied ever trying to grab
Doe's brother's penis or touch him inappropriately. Rivera testified that Doe would come
to his house to study and "hang out for an hour or two[.]" Rivera denied showing Doe
pornographic videos. Rivera also denied committing the offenses alleged in the indictment. 
Rivera explained that he knew that Doe had an adopted brother who was born in Mexico, and
Doe's mother knew that Rivera possessed that knowledge. In addition, Rivera explained that
during a meeting with Doe and his parents, Doe's parents confronted Rivera about what
Doe's brother J.G. had told them. Rivera also denied threatening anyone at the meeting, and
he denied renting pornographic videos.

Closing Arguments


 During closing arguments, the State discussed J.G.'s testimony, but did not strongly
emphasize it. Before discussing J.G.'s testimony, the State mentioned the limiting instruction
and explained to the jury the permissible purposes for which J.G.'s testimony could be
considered. In discussing J.G.'s testimony, the State argued as follows:

 And then, what did [Rivera] do when he had access to the children? 
[Doe] doesn't know what - and [J.G.] don't [sic] know what things are classic
as far as grooming a child. Ms. Farrar does. And that's exactly what he did. 
He put himself in a position of authority and influence over those children. He
then began to gradually show them different things, "How do you like that?" 
He brought about in them an appetite for things that are unmentionable.


 And then, after he had taken their defenses down, he took advantage of
the children. Luckily, [J.G.] had the strength of will that [Doe], being who he
is, didn't have. And [J.G.] resisted to the point that he was not subject to the
abuse that [Doe] was.


On the other hand, defense counsel discussed J.G.'s testimony in great detail during his
closing, arguing as follows:

 I'm going to talk about [J.G.]. . . . And during voir dire I read the
instruction to you earlier. . . . Evidence is introduced for one purpose but not
for another. And [the trial judge] gave you the written instruction regarding
that, and [J.G.] is not the Mark Doe in the indictment. Mr. Rivera is not on
trial for anything he did to [J.G.]. . . .


 And I want to explain to you why you should not consider the testimony
of [J.G.] for any purpose. And the reason is that the State did not prove what
he said beyond a reasonable doubt.


 [J.G.] testified to a number of incidents, but he could only specifically
remember two incidents. Only two. And they happened when he was either
10, 11, or 12 years old. When he testified, he was 21 years old. When he first
reported these, he was 19 years old. So he is trying to remember when he is
19 and when he is 21 something he thinks happened when he was 10, 11, or
12.


 The incident - the more significant incident is the incident in which he
alleges that Mr. Rivera tried to grab his penis. . . . This happened at night. It
happened while [J.G.] was asleep on the floor. And if I understand correctly,
[Rivera] was sleeping next to him. According to [J.G.], he felt Mr. Rivera put
his hand on his stomach and then tried to grab his penis. He did not testify that
Mr. Rivera grabbed his penis.


 What if Mr. Rivera wanted to grab a 10-, 11-, or 12-year-old child's
penis alone in his room in his house with Mr. Rivera, what prevented him from
doing so? He could have done it. But [J.G.] does not testify that he did do it. 
He testified that he tried to do it. And his testimony can best be explained as
the faulty memory of something that happened when he was a child, when he
was waking up, when he was not fully conscious, happening seven or eight or
nine years earlier.


 The grabbing, the attempted grabbing of the penis incident, if I
understand correctly, happened only one time. But [J.G.] also testified that
Mr. Rivera grabbed his leg and caressed his ear, caressed his ear more than
once. But he could only specifically remember one occasion. And grabbing
of the ear and caressing . . . of the leg and caressing the ear could readily be a
misunderstood conduct by Mr. Rivera, easily, which Mr. Rivera would have
no memory of whatsoever.


 . . . .


 The State has not proven the allegations of [J.G.] beyond a reasonable
doubt; and, therefore, you should not consider them for any purpose.


In addition to his discussion of J.G.'s testimony, defense counsel reiterated in his closing
argument the same challenges to Doe's credibility that he had made in his opening statement. 
 During rebuttal, the State responded to defense counsel's arguments concerning J.G.'s
testimony as follows:

 [Defense counsel] told you that [J.G.] only remembered two specific
incidents; and that's true, in a way. He specifically remembered two incidents,
but he said that kind of touching happened a lot. But just like any other child,
he is only able to relate the specific time, place[,] or not even the time but the
place where it happened on two occasions but that's not . . . what he said about
just remembering two things.


 He asked you what prevented [Rivera] from going ahead and grabbing
him that night? Let me tell you. I can answer that question. Arturo, as the
years progressed, became more confident, more confident of his intimidation
of those boys, that they weren't going to tell on him. So confident that the last
act that we had testimony of was where he grabbed the boy's pants, [Doe's]
pants, pulled them down. [Doe] pulled them back up. He threw him on the
floor, and he forcibly raped him. He had become that confident.


 It went from the time with [J.G.] that when, yes, he did stop when [J.G.]
told him to, to the point that he was not going to be denied what he wanted. 
That's exactly the answer to that.


Issues One and Two


 In his first issue, Rivera argues the trial court erred by admitting acts of his previous
misconduct with J.G. because the evidence "was not probative of any disputed fact but was
only evidence of his general bad character." See Tex. R. Evid. 404(b). In his second issue,
Rivera contends the trial court erred by admitting the same evidence because its probative
value was substantially outweighed by its prejudicial effect. See Tex. R. Evid. 403. We
address Rivera's issues together.

Standard of Review


 We review a trial court's admission of extraneous offense evidence under an abuse
of discretion standard. Moses v. State, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003);
Montgomery v. State, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g). We must
uphold the trial court's ruling if it is within the zone of reasonable disagreement. Wheeler
v. State, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002) (en banc).

Rule 404(b)


 Rule 404(b) of the Texas Rules of Evidence provides as follows: 


 Evidence of other crimes, wrongs or acts is not admissible to prove the
character of a person in order to show action in conformity therewith. It may,
however, be admissible for other purposes, such as proof of motive,
opportunity, intent, preparation, plan, knowledge, identity, or absence of
mistake or accident. . . .


Tex. R. Evid. 404(b); see also Montgomery, 810 S.W.2d at 387. The list of enumerated
purposes for which extraneous offense evidence may be admissible under Rule 404(b) is
neither exclusive nor exhaustive. Montgomery, 810 S.W.2d at 387-88. Extraneous offense
evidence may be admissible if it has relevance apart from its tendency to prove a person's
character to show that he acted in conformity therewith. Id. at 387. However, the fact that
extraneous offense evidence is introduced for a purpose other than character conformity does
not, standing alone, make the evidence admissible. Webb v. State, 36 S.W.3d 164, 180 (Tex.
App.--Houston [14th Dist.] 2000, pet. ref'd) (en banc). Proferred extraneous offense
evidence must also be relevant to a fact of consequence in the case. Id. (citing Rankin v.
State, 974 S.W.2d 707, 709 (Tex. Crim. App. 1996)). Evidence is relevant if it tends to make
the existence of any fact of consequence more probable or less probable than it would be
without the evidence. Tex. R. Evid. 401. Extraneous offense evidence is admissible to rebut
defensive theories raised by defense counsel in an opening statement or during cross-examination of a State's witness. See Powell v. State, 63 S.W.3d 435, 438-39 (Tex. Crim.
App. 2001); Ransom v. State, 920 S.W.2d 288, 301 (Tex. Crim. App. 1996) (op. on reh'g). 
Rule 403


 Rule 403 of the Texas Rules of Evidence provides as follows: "Although relevant,
evidence may be excluded if its probative value is substantially outweighed by the danger of
unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of
undue delay, or needless presentation of cumulative evidence." Tex. R. Evid. 403. "Rule
403 favors admissibility of relevant evidence, and the presumption is that relevant evidence
will be more probative than prejudicial." Montgomery, 810 S.W.2d at 389. Once a trial
court determines that extraneous offense evidence is admissible under Rule 404(b), the trial
court must, upon proper objection by the opponent of the evidence, weigh the probative value
of the evidence against its potential for unfair prejudice. Id.; see Tex. R. Evid. 403. A Rule
403 analysis regarding unfair prejudice requires the trial court to balance the following
factors:

 (1) the inherent probative force of the proffered item of evidence along with
(2) the proponent's need for that evidence against (3) any tendency of the
evidence to suggest decision on an improper basis, (4) any tendency of the
evidence to confuse or distract the jury from the main issues, (5) any tendency
of the evidence to be given undue weight by a jury that has not been equipped
to evaluate the probative force of the evidence, and (6) the likelihood that
presentation of the evidence will consume an inordinate amount of time or
merely repeat evidence already admitted.


Gigliobianco v. State, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006); see also Erazo v.
State, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004). However, "if evidence of 'other crimes,
wrongs, or acts' has only character conformity value, the balancing otherwise required by
Rule 403 is obviated, the rulemakers having deemed that the probativeness of such evidence
is so slight as to be 'substantially outweighed' by the danger of unfair prejudice as a matter
of law." Montgomery, 810 S.W.2d at 387 (citing United States v. Beechum, 582 F.2d 898,
910 (5th Cir. 1978)).

Application of the Law to the Facts


 Because Rivera's counsel filed a motion to exclude extraneous offense evidence under
Rule 403 and Rule 404(b) and properly objected to J.G.'s testimony, the State had the burden
to show that the evidence was relevant apart from its tendency to prove Rivera's character
and to show that he acted in conformity therewith. See Montgomery, 810 S.W.3d at 387; see 
Tex. R. Evid. 403, 404(b). At the hearing on Rivera's motion to exclude the evidence, the
State argued as follows: "My point is that I think it is the type of testimony that is contextual. 
It shows the jury the circumstances in which the charged offenses arose and how they came
to light. It does make - especially because, . . . that same type of conduct was initiated in the
beginning with the victim. It is going to make that child's testimony more plausible. . . ." 
In response, defense counsel argued, "It doesn't show motive, opportunity, intent,
preparation, plan, knowledge, identity, or absence of mistake or accident and it is
significantly different. It doesn't show any of those." The trial court stated its ruling as
follows:

 At this time the Court is going to find that the purported testimony of [J.G.]
that [sic] the probative value is not substantially outweighed by the danger of
unfair prejudice. I'm going to find that it can be used to show proof of motive,
opportunity, intent, preparation, plan, or knowledge; and I will give any
instructions you wish if . . . [the State] decide[s] to put that in tomorrow.

 

 The State contends that J.G.'s testimony was admissible to rebut the defensive theories
introduced during defense counsel's opening statement, including lack of opportunity to
commit the charged offenses and Doe's alleged lack of credibility. We agree. As discussed
above, defense counsel argued in his opening statement that because Rivera's home was a
small mobile home and three other people lived there, Rivera could not have committed the
acts that Doe testified occurred at the home. Therefore, we find that J.G.'s testimony that
Rivera acted inappropriately with him and attempted to touch his penis while he was at
Rivera's home was admissible to rebut Rivera's theory of lack of opportunity, and said
testimony therefore had relevance apart from its tendency to show Rivera's character and that
Rivera acted in conformity therewith. See Tex. R. Evid. 404(b); Powell, 63 S.W.3d at 438-39. Accordingly, because the trial court's ruling was within the zone of reasonable
disagreement, the trial court did not abuse its discretion by determining that the evidence was
admissible under Rule 404(b). See Tex. R. Evid. 404(b); Wheeler, 67 S.W.3d at 888.

 Defense counsel also stated during opening argument that Doe's parents never noticed
any physical or emotional problems with him; that Doe never seemed reluctant to have
contact with Rivera; that the nurse who examined Doe found no physical evidence of sexual
assault; that Doe told two people that Rivera did not sexually assault him; that Doe possibly
had a motive to fabricate the allegations because of Rivera's knowledge that Doe's mother
had illegally adopted a child from Mexico; and that Rivera would testify that the offenses
described by Doe did not occur. We therefore find that the trial court did not abuse its
discretion by determining that J.G.'s testimony concerning extraneous offenses by Rivera
was admissible under Rule 404(b). See Tex. R. Evid. 404(b); Jaramillo v. State, 817 S.W.2d
842, 844 (Tex. App.--Fort Worth 1991, pet. ref'd) (citing Montgomery, 810 S.W.2d at 394)
("A prerequisite for the admission of evidence to shore up a child complainant's testimony
is that the defendant must first deny the act or undermine or impeach the complainant in
some way before extraneous acts are admissible."); see also Powell, 63 S.W.3d at 438-39
(Extraneous offense may be admitted to rebut a defensive theory raised during opening
statement.). We overrule issue one.

 Having found that the trial court did not abuse its discretion by finding that J.G.'s
testimony was admissible under Rule 404(b) to rebut the defensive theories of lack of
opportunity and victim's alleged lack of credibility, both of which were raised in defense
counsel's opening statement, we must now determine whether the trial court abused its
discretion by determining that the probative value of J.G.'s testimony outweighed any unfair
prejudicial impact. See Tex. R. Evid. 403; Montgomery, 810 S.W.2d at 389. The trial court
could reasonably have concluded that the probative value of J.G.'s testimony concerning
Rivera's grooming behaviors and Rivera's attempt to make inappropriate sexual contact with
him despite the presence of three other individuals in the home outweighed the potential
prejudice to Rivera. In addition, the trial court could have found that the State's need for the
evidence was considerable, since Rivera put forth defensive theories of both lack of
opportunity and Doe's alleged lack of credibility. See Tex. R. Evid. 403; see generally
Gigliobianco, 210 S.W.3d at 641-42.

 In addition, the trial court could have reasonably concluded that J.G.'s testimony did
not tend to suggest that the jury decide the case on an improper basis. See generally
Gigliobianco, 210 S.W.3d at 641-42. The conduct in which J.G. testified Rivera engaged
with him (inappropriate conversation, touching, kissing, showing of pornographic materials,
and an unsuccessful attempt to touch J.G.'s penis) was much less serious and potentially
inflammatory than the offenses Rivera was charged with committing against Doe (multiple
instances of oral and anal penetration over a period of approximately two years). 
Furthermore, the trial court could have reasonably concluded that J.G.'s testimony did not
tend to confuse or distract the jury from the primary issues. See generally id. J.G.'s
testimony did not consume an inordinate or disproportionate amount of the State's case, and
the State presented other compelling evidence of Rivera's guilt, such as Doe's testimony, as
well as that of Farrar, Detective Parrish, and Armstrong, and the physical evidence seized
from Rivera's home.

 Moreover, the trial court could have reasonably concluded that J.G.'s testimony did
not tend to mislead the jury. See Tex. R. Evid. 403; see generally Gigliobianco, 210 S.W.3d
at 642. The trial court gave a limiting instruction to the jury that thoroughly explained the
permissible purposes for which it could consider J.G.'s testimony, and the State also
emphasized to the jury in its closing argument the limited purposes for which it could
consider the evidence. Finally, the trial court could have reasonably concluded that J.G.'s
testimony did not cause undue delay or constitute the needless presentation of cumulative
evidence. J.G.'s testimony did not consume a large portion of the trial, and it was not
cumulative of other evidence. J.G. testified only for a short time; his testimony is
approximately 59 pages of the 436-page reporter's record of the guilt-innocence phase.

 For all of these reasons, we conclude that the trial court did not abuse its discretion
by determining that the probative value of J.G.'s testimony outweighed any unfairly
prejudicial impact. See Tex. R. Evid. 403; Page v. State, 213 S.W.3d 332, 337-38 (Tex.
Crim. App. 2006). We overrule issue two.

Conclusion


 The trial court did not abuse its discretion by determining that J.G.'s testimony was
admissible under Rule 404(b), and that the probative value of J.G.'s testimony was not
outweighed by the danger of unfair prejudice. See Tex. R. Evid. 403, 404(b). Having
overruled both of Rivera's issues, we affirm the trial court's judgment.

 AFFIRMED.

 ________________________________

 STEVE McKEITHEN

 Chief Justice

Submitted on August 14, 2008

Opinion Delivered October 15, 2008 

Publish

Before McKeithen, C.J., Gaultney and Kreger, JJ.
1. Prior to trial, Rivera's counsel filed a motion to suppress evidence of extraneous
offenses, and the court denied the motion. In addition, when the State offered the testimony
of J.G. regarding Rivera's actions, defense counsel objected, obtained a running objection
to all such testimony, and obtained a limiting instruction. The limiting instruction read as
follows:


 Evidence has been introduced that the Defendant committed offenses,
wrongs or acts, other than that for which he is on trial, with respect to [J.G.]. 
You are instructed that you can not consider such evidence for any purpose
unless you first find from the evidence presented beyond a reasonable doubt
that the Defendant did commit those other offenses, wrongs or acts, if any,
with respect to [J.G.]. Therefore, if the State has not proven the Defendant's
guilt of those other offenses, wrongs or acts, if any, beyond a reasonable doubt,
or if you have a reasonable doubt of the Defendant's guilt of those other
offenses, wrongs or acts, if any, you shall not consider such evidence for any
purpose.


 Further, even if you find that the State has proven, beyond a reasonable
doubt, the Defendant's guilt of those other offenses, wrongs or acts, if any,
with respect to [J.G.], you may only consider such evidence as evidence of
motive, opportunity, intent, preparation, plan, or knowledge, in relation to the
offense for which Defendant is on trial, and you may not consider those other
wrongs or acts, if any, for any other purpose.
2. Lisa Sebaugh, an educational diagnostician with Livingston Independent School
District, testified that Doe has learning disorders and is enrolled in the school's special
education program. Sebaugh opined that because of his learning disabilities, Doe would
have difficulty testifying.