

# NUMBER 13-09-00008-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

EDWARD BRANTON WHITE A/K/A
EDWARD BRANDON WHITE,                                    Appellant,

v.

THE STATE OF TEXAS,                                       Appellee.

On appeal from the 117th District Court
of Nueces County, Texas.

# MEMORANDUM OPINION

**Before Justices Rodriguez, Garza, and Benavides
Memorandum Opinion by Justice Garza**

Appellant, Edward Branton White a/k/a Edward Brandon White, was charged by

indictment with driving while intoxicated ("DWI"), a class B misdemeanor. *See* TEX. PENAL

CODE ANN. § 49.04(a)-(b) (Vernon 2003). This charge was enhanced because appellant

had two prior convictions for DWI and two prior felony convictions for retaliation and bail

jumping. *See id.* §§ 12.42(d),[1] 49.09(b)(2) (Vernon Supp. 2009). A Nueces County jury convicted White of the underlying offense, and the trial court sentenced him to twenty-five years' incarceration in the Institutional Division of the Texas Department of Criminal Justice ("TDCJ-ID") with no fine. By three issues on appeal, appellant asserts that: (1) his retained trial counsel, John Gilmore, did not provide him with effective assistance; (2) evidence supporting the enhancement paragraph of the indictment was legally and factually insufficient; and (3) the judgment of conviction is void because the jury's verdict was not unanimous. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

White was indicted for the underlying offense on June 26, 2008. Prior to trial, Gilmore filed numerous motions with the trial court, including: (1) a motion in limine; (2) a rule 404(b) request for notice of the State's intent to offer extraneous conduct evidence, *see* TEX. R. EVID. 404(b); (3) a motion for discovery, production, and inspection of evidence; and (4) a motion to prohibit the State from introducing statements made by White to police. The trial court granted White's motion in limine but did not rule on the other motions filed.

### A. The Guilt-Innocence Phase

Trial commenced on December 1, 2008. At trial, the State called several witnesses, including Milton Lugo and Corpus Christi police officers Michael Rogers and John McGinley, to establish that White was driving his truck while intoxicated.

---

[1] Section 12.42(d) of the penal code provides the following:

Except as provided by Subsection (c)(2), if it is shown on the trial of a felony offense other than a state jail felony . . . that the defendant has previously been finally convicted of two felony offenses, and the second previous felony conviction is for an offense that occurred subsequent to the first previous conviction having become final, on conviction he shall be punished by imprisonment . . . for life, or for any term of not more than 99 years or less than 25 years.

TEX. PENAL CODE ANN. § 12.42(d) (Vernon Supp. 2009).

Lugo, White's neighbor, testified at trial that, on the day in question, he was inside his house when he heard White yelling for Lugo to move his truck. Lugo testified that he had known White for several years and that it appeared to him that White was intoxicated because White was yelling and slurring words. Upon viewing White's erratic behavior, Lugo instructed his girlfriend to call the police. On cross-examination, Lugo admitted that he and White had an ongoing dispute regarding ownership of a driveway and the fence between their houses. Lugo acknowledged that he had called the police complaining about White on several occasions in the past year.

Officer Rogers testified that when he arrived at the scene, he saw White's truck back into the driveway and White exit the truck from the driver's side with the keys to the truck in his hand. When Officer Rogers approached White to question him about the disturbance, White got into an aggressive, fighting stance. Officer Rogers tried to calm White and get him to sit down so they could discuss the incident; however, White resisted and the two men wrestled and fell onto a piece of equipment in the driveway. As a result of the fall, White sustained lacerations to his head. Officer Rogers testified that he believed White was intoxicated because he was swaying, his speech was slurred, his eyes were bloodshot, and his breath smelled of alcohol. Officer Rogers asked White to provide a breath sample and to perform field sobriety tests, but White refused to comply. White was then taken to the hospital to treat the laceration to his head. While en route to the hospital, White volunteered to give a blood sample but later refused to do so. On cross-examination, Officer Rogers admitted that he did not personally see White driving and that the only thing he saw was White get out of the truck with the keys in his hand. Moreover, Officer Rogers noted that White's belligerence likely was due to his unhappiness with being questioned by police.

Officer McGinley testified that he assisted Officer Rogers on the disturbance call. Officer McGinley recalled seeing White exit the driver's side of the truck with the truck keys in his hand. Officer McGinley found the truck keys in White's pocket when conducting a pat down. Officer McGinley noted that: (1) White was very aggressive; (2) he and Officer Rogers "smelled quite a bit of alcohol" on White's breath; and (3) White was wobbly, had red, glassy eyes, and slurred speech. Officer McGinley further noted that, while on the way to the hospital, White expressed that he would "settle for a P.I. and the criminal mischief to the neighbor's door" in exchange for dropping the DWI charge. Officer McGinley had no doubt that White was intoxicated at the time in question. On cross-examination, White's trial counsel questioned Officer McGinley about White's repeated statements that he was not driving the truck and emphasized that Officer McGinley had not actually seen White driving the truck.

White called several witnesses on his behalf, including his father, Edward White, Lane Burke, and Johnny Paiyou. Edward testified that White lived with him, but at the time in question, Edward was not home. Edward further testified that he had a video surveillance system that was installed outside the house. The system recorded the arrest of White, and Edward alleged that the video showed that Paiyou was driving the truck. Edward later admitted that he accidentally destroyed the video recording the arrest. Edward also testified that White and Lugo had a long-standing feud.

Lane Burke testified that he worked for White in White's tree business and that, at the time in question, he was a passenger in White's truck and Paiyou was driving the truck. The State impeached Burke by noting his prior convictions for theft and possession of a controlled substance. Burke later admitted that he left the scene before the police arrived.

4

Paiyou testified that he worked for White's tree company and that two years ago, White fell forty feet from a tree and was in a coma for over thirty days. Paiyou noted that he was aware that White was in a custody battle with his ex-wife, Alicia Reynaga, in Minnesota and that Reynaga had allegedly fled from Corpus Christi to Minnesota with White's son. Paiyou testified that at the time in question, he was driving the truck and there had not been a disturbance between White and Lugo. However, on cross-examination, the State impeached Paiyou with a litany of convictions. On re-direct examination, Paiyou stated that he did not believe that White was intoxicated.

The defense rested, and the State announced that it had a surprise rebuttal witness, which Gilmore surmised was Reynaga. Gilmore inquired about the substance of Reynaga's testimony and asserted that Reynaga's testimony was subject to the order in limine prohibiting the introduction of White's previous bad acts.

However, before Reynaga testified, a juror communicated to the trial court that he had been harassed by a witness in the case. The witness was later identified as Paiyou. The juror stated that Paiyou made the following comments while in the juror's presence: "We can't tamper with the jurors. Hey, jurors, hey jurors . . . ." The juror believed that Paiyou was mocking the jurors and that as a result of the comments, the juror did not believe that Paiyou was a credible person. The juror stated that he did not tell any other jurors about the incident and that he was the only one who overheard the comments made by Paiyou. After discussing the situation with counsel for both sides, the juror was excused from service on the jury; the parties agreed to proceed with eleven jurors.[2] The trial court informed the remaining jurors about the situation and instructed them that their verdict still

---

[2] White's trial counsel requested a mistrial, but then expressed that his client desired to proceed with eleven jurors.

5

needed to be unanimous.

Reynaga testified that she was previously in a long-term relationship with White and that they had a son together. Reynaga admitted that she kept in contact with Paiyou in order to check up on White. She noted that Paiyou told her that White had paid him to provide false testimony—that Paiyou was the driver of the truck when it had actually been White. White's trial counsel objected to this question and answer, and the State responded that it was using the testimony for impeachment purposes. A hearing was conducted outside the jury's presence and, after previewing Reynaga's testimony, the trial court overruled White's objection. Reynaga stated that when White and Paiyou were in the truck together, White always drove. She also stated that White would "drink and drive a lot." On cross-examination, Gilmore implied that Reynaga desired to have White sent to prison so that she could get custody of their son. Reynaga confirmed that White and Lugo do not get along. On re-direct, Reynaga testified that she had to get a protective order against White because he had abused her in the past. She also testified that Edward was not truthful and would lie to protect his son.

The State then rested. During closing argument, Gilmore conceded that White was intoxicated at the time in question and stated that the only issue for the jury to decide was whether White drove the truck. He argued that the only person who alleged to have seen him driving the truck was Lugo, the next-door neighbor with whom White had an ongoing feud. The jury subsequently convicted White of felony DWI.

**B. The Punishment Phase**

White elected for the trial court to assess punishment. At the hearing, the State called Mike Hummel, a member of the Corpus Christi city council, and Nueces County

Sheriff's Department Lieutenant Fred Flores to establish White's prior felony convictions. Councilman Hummel testified that he worked previously for the Nueces County District Attorney's Office and that he had prosecuted White before. Councilman Hummel recalled prosecuting White for retaliation in June 1993, and that White received probation for that charge. Councilman Hummel also noted that White's probation was revoked in 1995. The judgment corresponding to White's previous retaliation conviction was tendered and admitted into evidence.

Lieutenant Flores testified that he had worked for the Nueces County Sheriff's Department for thirty-one years as a fingerprint expert. Lieutenant Flores compared fingerprints that were taken recently from White to fingerprints in State's exhibit 11, which was the pen packet associated with White's felony bail jumping conviction. Lieutenant Flores testified that the fingerprints in the pen packet matched the fingerprints that White had given previously. State's exhibit 11 was then tendered and admitted into evidence.

Once the State rested, White called several witnesses to testify as to his brain injury and his good deeds in the community. In particular, Ramona Pumarejo testified that she has known White for many years and that she cleans his house and answers the phone for White's business. Ramona did not believe that White was a dangerous man and thought of him as a helpful and considerate person. She even stated that White was "like a son to [her.]" She pleaded with the trial court to sentence White to a treatment facility rather than prison because White "takes care of [her.]" In his closing statement, Gilmore referenced White's brain injury and requested that the trial court sentence White to a substance abuse treatment facility rather than prison. The trial court concluded that the State had proven beyond a reasonable doubt that White had two previous felony

convictions, two previous DWI convictions, and committed the underlying offense. White was sentenced to twenty-five years' incarceration in the TDCJ-ID.

## C. The Hearing on White's Motion for New Trial

White filed a motion for new trial on January 2, 2009, and the trial court conducted a hearing on the motion shortly thereafter. In his motion and at the hearing, White argued, among other things, that the jury's verdict was improper because it was not signed by all eleven jurors, and that his trial counsel provided ineffective assistance. At the hearing, White called several witnesses to opine on the effects of his brain injury and how the injury often caused White to appear as if he was intoxicated.

### 1. White's Evidence

Jarrett Ursprung, the owner of a local tree service and friend of White's, testified that, after the accident, White often appeared slow, his speech was slurred, and he was clumsy. Ramona and Rudolph Pumarejo both testified that, after the accident, White exhibited signs of intoxication, such as slurred speech and bad balance. Rudolph further testified that, after the accident, it was difficult to communicate with White and that White often got angry when attempting to communicate with others. Rudolph noted that White's personality changed after the accident, and that it often seemed as if White "wasn't all there." Rudolph testified that White's trial counsel never contacted him to testify.

White's friend, Jeffrey Buck, stated that: (1) he was present at the time of the incident; (2) he was named as a witness in the police report; and (3) he was standing in his garage when the police arrived. Buck noted that he had known White since high school and that White had always been a "wild person." Buck further noted that White is "pushy," "antsy," "loud," and "bossy," but when he took his medicine, White was "a little more

8

relaxed." On cross-examination, Buck admitted that he was not close enough to White to determine if he had been drinking at the time in question. Buck also admitted that he could not tell if White's demeanor was caused by alcohol, medication, or something else. Buck testified that he was never asked to testify but that he would have been present if asked. Buck also testified that he told the prosecutor that he did not see exactly where White was at the time in question.

White testified that he never communicated with his trial counsel about the case and that he was not included in the preparation for trial. White noted that he took Lindane to remedy scabies and that the medication caused him neurological damage. White recalled an incident in Minnesota where he was riding around on a bicycle allegedly yelling at other people and generally "acting like a crazy person." White testified that Minnesota police believed that he was intoxicated and administered a breath test; however, the breath test revealed that White was not intoxicated. White also recalled that the night before the incident, he drove back from Alabama, where he attended his mother's funeral, and that he had not had much sleep that night. White testified that an administrative hearing was initiated to revoke his driver's license in connection with this incident and the administrative law judge ruled in White's favor and allowed him to keep his driver's license. White claimed that: (1) he does not drink anymore; (2) he remembered the State offered him a plea offer of seven years; and (3) he did not understand that, by rejecting the plea offer, he would be subject to a punishment range of twenty-five years to life.

## 2. The State's Evidence

The State called Gilmore to testify as to his representation of White at trial. Gilmore stated that he has known White for more than ten years and that White had retained his

9

services. Gilmore did not recall any difference in White's competence or mental abilities over the ten years he had known him. Gilmore testified that once White was indicted, he met with White to prepare for trial. Gilmore recalled that White expressed a desire to secure the presence of his witnesses, who also happened to be his friends. Gilmore allowed White to secure the presence of the witnesses but instructed White to bring everyone to Gilmore's office for trial preparation. Gilmore remembered meeting with Paiyou and Burke, but he noted that Buck never showed up to his office. Gilmore testified that White told him that Buck "wasn't around anymore . . . that he was out of state or he was someplace." Gilmore recalled that he got the State's witness list from the District Clerk. Gilmore testified that he was aware of Paiyou's criminal history, but not Burke's. Gilmore further testified that he did not pursue Buck's testimony because Gilmore was under the impression that Buck did not know the whereabouts of White at the time in question and that his trial strategy was to demonstrate that White was not driving the truck, rather than challenging whether White was intoxicated. With respect to Reynaga, Gilmore stated that his primary concern was not to impeach her with her previous criminal convictions but, rather, to demonstrate that her testimony was not credible because she was trying to get White sent to prison in order to get custody of the couple's son.

The trial court denied White's motion for new trial.

## II. STANDARD OF REVIEW

A trial court's denial of a defendant's motion for new trial is reviewed for abuse of discretion. *See Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006); *see also Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004).

We do not substitute our judgment for that of the trial court, but rather

10

we decide whether the trial court's decision was arbitrary or unreasonable. We must view the evidence in the light most favorable to the trial court's ruling and presume that all reasonable factual findings that could have been made against the losing party were made against that losing party. Thus, a trial court abuses it discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling.

*Charles*, 146 S.W.3d at 208.

The defendant generally has the burden of proof on a motion for new trial. *See Patrick v. State*, 906 S.W.2d 481, 498 (Tex. Crim. App. 1995) (en banc). The proponent of the motion for new trial bears the initial burden of establishing facts entitling him to the relief sought. *See Marquez v. State*, 921 S.W.2d 217, 222 (Tex. Crim. App. 1996) (en banc). Furthermore, at the hearing on a motion for new trial, the trial court is the trier of fact and the sole judge of the credibility of the witnesses. *See Melton v. State*, 987 S.W.2d 72, 75 (Tex. App.–Dallas 1998, no pet.) (citing *Lewis v. State*, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995)).

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

By his first issue, White contends that Gilmore did not provide effective assistance of counsel. White argues, in several sub-issues, that Gilmore failed to: (1) investigate and present evidence of his "traumatic brain injury"; (2) "seek out and call witnesses who could attest to White's medical conditions, to include expert testimony on White's personality disorder, and . . . seek out fact witnesses"; (3) present the Pumarejos' testimony as to his post-accident mental state; (4) "investigate previous incidents caused by Mr. White's mental history and his medical history"; and (5) obtain rulings on various pre-trial motions. White asserts that, but for Gilmore's alleged errors, there is a reasonable probability that the outcome of the trial would have been different. The State argues that the record does

11

not demonstrate that Gilmore was deficient in his investigation of the case or in pursuing his trial strategy of establishing that White was not driving the truck at the time in question. The State further argues that White did not establish that the witnesses and evidence that trial counsel allegedly failed to pursue were more than marginally favorable to his defense.

## A. Applicable Law

To establish a claim for ineffective assistance of counsel, White must show (1) his attorney's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for his attorney's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 689 (1984); *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986); *Jaynes v. State*, 216 S.W.3d 839, 851 (Tex. App.–Corpus Christi 2006, no pet.). Whether this test has been met is to be judged on appeal by the totality of the representation, not by any isolated acts or omissions. *Jaynes*, 216 S.W.3d at 851. The burden is on the appellant to prove ineffective assistance of counsel by a preponderance of the evidence. *Id.* Our review of counsel's representation is highly deferential, and we will find ineffective assistance only if the appellant overcomes the strong presumption that his counsel's conduct fell within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689; *Jaynes*, 216 S.W.3d at 851. The right to "reasonably effective assistance of counsel" does not guarantee errorless counsel or counsel whose competency is judged by perfect hindsight. *Saylor v. State*, 660 S.W.2d 822, 824 (Tex. Crim. App. 1983). Further, the acts or omissions that form the basis of appellant's claim of ineffective assistance must be evidenced by the record. *See Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999); *Jaynes*, 216 S.W.3d at 851. In most cases, a silent record which provides no

explanation for counsel's actions will not overcome the strong presumption of reasonable assistance. *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001); *Thompson*, 9 S.W.3d at 813-14.

## B. Discussion

White's primary contention is that Gilmore provided ineffective assistance by failing to investigate and present evidence of White's brain injury. White alleges that, as a result of his brain injury, he often had slurred speech and stumbled, which could be interpreted as being intoxicated. At the motion for new trial hearing, Gilmore testified that he conceded the issue of intoxication and chose to challenge the State's evidence as to whether White was operating the truck. The court of criminal appeals recently stated that "[t]he fact that another attorney may have pursued a different tactic at trial is insufficient to prove a claim of ineffective assistance.'" *Ex parte Miller*, No. AP-76,167, 2009 Tex. Crim. App. LEXIS 1486, at *10 (Tex. Oct. 28, 2009) (quoting *Scheanette v. State*, 144 S.W.3d 503, 509 (Tex. Crim. App. 2004)). Furthermore, the record reflects that: (1) Paiyou testified at the guilt-innocence phase as to White's accident and the fact that he had been in a coma for over thirty days; and (2) Gilmore referenced White's brain injury in his closing statements, thus alerting the jury to White's brain injury. In addition, White did not present any expert testimony to support his theory that the brain injury caused him to appear intoxicated. Instead, White relied on the testimony of friends at the motion for new trial hearing who speculated as to White's demeanor and whose testimony conflicted with Gilmore's testimony. Given the nature of the circumstantial evidence suggesting that White was the driver of the truck at the time in question, we conclude that Gilmore's trial strategy of attacking the State's evidence as to whether White was driving the truck was

13

a reasonable trial strategy. Moreover, White has not demonstrated that, based on the evidence contained in the record, the admission of his medical records and other evidence documenting his brain injury would have resulted in a different jury verdict, especially in light of the testimony offered by Officers Rogers and McGinley, who testified that when they encountered White at the time in question, White had slurred speech, bloodshot eyes, poor balance, and alcohol on his breath. *See Strickland*, 466 U.S. at 689; *Hernandez*, 726 S.W.2d at 57; *Jaynes*, 216 S.W.3d at 851.

White also contends that Gilmore provided ineffective assistance by failing to call Buck and the Pumarejos to testify as to what happened at the time in question and White's demeanor. At the hearing on White's motion for new trial, Buck testified that White was a "wild person" and that he was "loud" and "bossy." Buck admitted that White always acted this way and that he could not tell whether White's demeanor was caused by alcohol, drugs, or something else. Moreover, Buck stated that, at the time of the incident, he observed the police arrive from his garage but that he was unsure as to White's whereabouts. Gilmore testified that he relied on White to secure the presence of the witnesses given that White expressed that he would bring his friends to testify on his behalf. Gilmore further testified that Buck was mentioned as a potential witness, but he never showed up to Gilmore's office and White informed Gilmore that Buck "wasn't around anymore." Regardless, Buck's admission that he was unsure of White's whereabouts at the time in question suggests that his testimony would not have aided the jury in determining White's sole issue in dispute at trial—whether he was driving the truck.

With respect to the testimony of the Pumarejos, White alleges that their testimony would have refuted the State's theory that he was intoxicated and Gilmore's failure to call

14

them as witnesses amounted to ineffective assistance. As noted earlier, Ramona testified at the motion for new trial hearing that White's speech was slurred and he had bad balance as a result of his brain injury. Rudolph noted that White was temperamental, angry, and "wasn't all there" after sustaining the injury to his brain. This testimony, if true, would have only been of marginal benefit to White's argument at trial—that he was not driving the truck at the time in question. At the motion for new trial hearing, White did not elicit testimony from the Pumarejos stating that they witnessed the incident or had personal knowledge as to whether White was driving the truck at the time in question. Thus, White has not demonstrated how Gilmore's failure to call the Pumarejos as witnesses during the guilt-innocence phase caused the jury to improperly convict him.

White further argues that Gilmore erred in failing to present a police report documenting an incident in Minnesota where White was mistakenly stopped for being intoxicated. The police report, which was admitted at the motion for new trial hearing as defendant's exhibit 10, indicated that White claimed to be drunk at the time of the stop by Minnesota police and requested to take a breathalyzer test. The results of the test indicated that White was not drunk, but the officer conducting the stop believed that White "was just looking for a reaction." Again, this evidence would only be of marginal significance considering the testimony of Officers Rogers and McGinley who testified that they smelled alcohol on White's breath and observed White exhibit many other signs of intoxication. Moreover, this incident does not address whether White drove the truck at the time in question.

By his next sub-issue, White complains about Gilmore's preparation and cross-examination of Reynaga and Lugo. In particular, White alleges that Gilmore failed to: (1)

obtain a ruling on his pretrial motion for discovery regarding Reynaga's criminal history; (2) object to damaging character evidence presented by Reynaga; (3) investigate Reynaga's impeachment evidence; (4) investigate bias and motive as to Lugo; and (5) request a limiting instruction as to Reynaga's testimony regarding the alleged bribery of Paiyou. Based on our review of the record, we cannot say that White has established that, but for these alleged isolated incidents, the jury would have rendered a different verdict.

With respect to Reynaga, the record reflects that Paiyou testified that White and Reynaga were in a custody battle over their son and suggested that Reynaga had fled to Minnesota to keep the child away from White. Reynaga admitted on cross-examination that when they broke up, she and White were not friendly. In addition, Gilmore, in cross-examining Reynaga, seemed to suggest that Reynaga's testimony was not credible because she had an interest in seeing White incarcerated in order to obtain custody of the couple's son. The record also reflects that Gilmore objected numerous times to Reynaga's testimony, which included references to various bad acts allegedly perpetrated by White. Furthermore, at the motion for new trial hearing, Gilmore testified that his primary concern in cross-examining Reynaga was to present to the jury that Reynaga desired to see White incarcerated so that she could get custody of their son, rather than to impeach her with her prior criminal conviction for DWI. We cannot say that this trial strategy was unreasonable.

With respect to Lugo, both Edward and Reynaga testified that there was a long-standing feud between Lugo and White, which, according to Lugo, centered on the ownership of a driveway that was situated between White's and Lugo's houses. Clearly, Gilmore elicited testimony about Lugo's possible bias against White. Furthermore, in light of the testimony given by Edward and Reynaga, the introduction of the police records

16

referred to by White on appeal would have been merely cumulative of Edward's and Reynaga's testimony and would have only been of marginal benefit to the jury in determining any bias on the part of Lugo.

White next argues that Gilmore's alleged failure to object or request a limiting instruction with regard to Reynaga's testimony about the bribery of Paiyou amounted to ineffective assistance. We first note that the court of criminal appeals has held that attempts to tamper with a witness or bribe a witness constitutes evidence of "consciousness of guilt" on the part of the defendant. *See Gonzalez v. State*, 117 S.W.3d 831, 842 (Tex. Crim. App. 2003); *Wilson v. State*, 7 S.W.3d 136, 141 (Tex. Crim. App. 1999); *Ransom v. State*, 920 S.W.2d 288, 299 (Tex. Crim. App. 1996) (op. on reh'g) ("We have held that criminal acts that are designed to reduce the likelihood of prosecution, conviction, or incarceration for the offense on trial are admissible under Rule 404(b) as showing 'consciousness of guilt.'"); *see also* TEX. R. EVID. 404(b) (providing that extraneous acts are generally inadmissible at the guilt-innocence stage of trial). Therefore, evidence of the alleged bribe was admissible to impeach Paiyou's testimony and to indicate White's consciousness of guilt. In any event, the record reflects that Gilmore objected to this testimony as hearsay, which the trial court, after conducting a hearing outside the presence of the jury, overruled. Nevertheless, White does not show how any limiting instruction would have been consistent with the defensive issues raised at trial. *See Ex parte Varelas*, 45 S.W.3d 627, 632 (Tex. Crim. App. 2001). Moreover, the record is silent as to nuances of Gilmore's trial strategy in not requesting a limiting instruction regarding Reynaga's testimony about the bribery. *See Mallett*, 65 S.W.3d at 63; *Thompson*, 9 S.W.3d at 813-14. Thus, we cannot say that appellant met his burden of showing that Gilmore's

assistance was ineffective with respect to this sub-issue.

In his final sub-issue, White complains that Gilmore failed to obtain a ruling on collateral estoppel. Specifically, White argues that the State was collaterally estopped from pursuing the DWI charge because an administrative law judge had concluded previously that the State lacked probable cause for the arrest. This argument, however, is without merit in light of section 724.048(a) of the transportation code, which provides that:

> The determination of the department of administrative law judge . . . is a civil matter . . . is independent of and is not an estoppel as to any matter in issue in an adjudication of a criminal charge arising from the occurrence that is the basis for the suspension or denial; and . . . does not preclude litigation of the same or similar facts in a criminal prosecution.

TEX. TRANSP. CODE ANN. § 724.048(a) (Vernon 1999); *see Reynolds v. State*, 4 S.W.3d 13, 18-21 (Tex. Crim. App. 1999). Therefore, the State was not collaterally estopped from prosecuting White for the underlying offense even though the administrative law judge determined that White's arrest was not supported by probable cause. The record does not support a finding that Gilmore provided ineffective assistance by failing to obtain a ruling on collateral estoppel.

In reviewing the totality of Gilmore's representation of White, we cannot say that White has overcome the "strong presumption" that Gilmore provided reasonable assistance. *See Strickland*, 466 U.S. at 689; *Jaynes*, 216 S.W.3d at 851. White's first issue is overruled.

## IV. THE ENHANCEMENT PARAGRAPH

By his second issue, White asserts that the State failed to produce legally and factually sufficient evidence to support the enhancement paragraph contained in the indictment, which subjected him to an enhanced punishment under the habitual felony-

18

offender statute. *See* TEX. PENAL CODE ANN. § 12.42(d). White argues that his two previous felony convictions ran concurrently and were executed on the same day, which suggests that his first conviction for retaliation was not "final" at the time that the offense made the basis of the second conviction was committed, and thus, did not follow the prescribed sequence for enhancement under section 12.42(d) of the penal code. *See id.* The State contends that it followed the proper sequence and presented legally and factually sufficient evidence to support the enhancement of White's punishment.

## A. Applicable Law

The court of criminal appeals has recently stated the following with respect to the sufficiency of the evidence supporting punishment enhancement for habitual felony offenders:

> The law concerning sufficiency of the evidence to prove enhancement for habitual felony offenders is well settled. Section 12.42(d) of the Penal Code requires the State to prove this chronological sequence of events:
>
> "(1) the first conviction becomes final;
>
> (2) the offense leading to a later conviction is committed;
>
> (3) the later conviction becomes final;
>
> (4) the offense for which the defendant presently stands accused is committed."

*Ex parte Miller*, 2009 Tex. Crim. App. LEXIS 1486, at *35 (quoting *Jordan v. State*, 256 S.W.3d 286, 290-91 (Tex. Crim. App. 2008)); *see Valdez v. State*, 218 S.W.3d 82, 84 (Tex. Crim. App. 2007); *see also* TEX. PENAL CODE ANN. § 12.42(d).

> The State carries the burden of proving beyond a reasonable doubt that a defendant's second previous felony conviction was committed after the defendant's first previous felony conviction became final. And when, "there is *no* evidence to show that the offenses were committed and became final

in the proper sequence, the defendant's sentence may not be enhanced under the State's habitual offender statutes."

*Jordan*, 256 S.W.3d at 291 (quoting *Tomlin v. State*, 722 S.W.2d 702, 705 (Tex. Crim. App. 1987)) (emphasis in original). The *Jordan* court further noted that:

> At the sentencing phase, neither party carries the burden of proving what punishment should be assessed within the statutorily prescribed range applicable to a given offense. Generally, the fact[]finder's decision of what particular sentence to assess is a "normative, discretionary function" that does not depend on the resolution of specific facts. However, when the State seeks to enhance a defendant's sentence for the primary offense by alleging that a defendant has a prior conviction, and the defendant enters a plea of not true, the fact[]finder must decide whether the State has sustained its burden by entering a finding that the enhancement allegation is either true or not true. In essence, the assessment of punishment involves two types of deliberations when the State has alleged, and the defendant has entered a plea of not true to, a prior conviction used for enhancement purposes. First, the fact[]finder engages in a deductive, discrete fact-finding process to determine whether the State has proved that the enhancement allegation is true. And second, considering all of the evidence admitted during the guilt and punishment phases, the fact[]finder engages in a normative process that is uninhibited by any required, specific fact determination to decide what particular punishment to assess within the range prescribed by law.

*Id.* at 291-92 (internal citations omitted). A failure of proof supporting the enhancement is not subject to a harmless error analysis; instead, "it is a sufficiency-of-evidence deficiency that can 'never be considered harmless.'" *Ex parte Miller*, 2009 Tex. Crim. App. LEXIS 1486, at *36 (quoting *Jordan*, 256 S.W.3d at 292).

The general rule, within the context of section 12.42 of the penal code, is that a conviction from which an appeal has been taken is not considered to be a final conviction until the conviction is affirmed by the appellate court and that court's mandate of affirmance becomes final. *See Jones v. State*, 711 S.W.2d 634, 636 (Tex. Crim. App. 1986) (en banc). The court of criminal appeals has held that:

[A]fter the State establishes that a defendant has been previously convicted,

20

this Court will presume that a conviction is final when faced with a silent record regarding such. Put another way, in the absence of evidence to the contrary, this Court presumes the regularity of the trial court's judgment and records. Thus, when the State offers into evidence a certified copy of a judgment and sentence, it has made a prima facie case that the conviction reflected within that judgment and sentence is a final conviction worthy of respect. That evidence is legally and factually sufficient to prove that a prior conviction is a final conviction absent any evidence to the contrary. If the judgment of conviction has been set aside, vacated or appealed, the defendant must offer some evidence to support that fact. Once the defendant offers that evidence, the State must prove, beyond a reasonable doubt, that the conviction has been affirmed and the mandate has issued.

. . . .

Although the wish may be father to the thought, the possibility of a future appeal is not the fact of a present appeal. The right to take an appeal does not equal the pendency of an appeal.

. . . .

Only when there is evidence that the defendant actually perfected an appeal is the conviction deemed to be lacking finality.

*Jones v. State*, 77 S.W.3d 819, 822-24 (Tex. Crim. App. 2002) (citations and quotation marks omitted). In other words, the "'burden is on the State to make a prima facie showing that any prior conviction alleged for enhancement, or for punishing an accused as a repeat offender, became final before the commission of the primary offense, and once such a showing is made, the burden shifts to the defendant to prove otherwise.'" *Jones*, 711 S.W.2d at 635 (quoting *Diremiggio v. State*, 637 S.W.2d 926, 928 (Tex. Crim. App. 1982)).

## B. Discussion

Here, the indictment contained an enhancement paragraph providing that White had two previous felony convictions for retaliation and bail jumping. The indictment further provided that White had two previous DWI convictions occurring on February 4, 1998, and December 15, 1998. White pleaded "not true" to the portion of the indictment referring to

his two previous DWI convictions and to the enhancement paragraph pertaining to the retaliation and bail jumping convictions. After reviewing the evidence presented at the punishment phase, the trial court concluded that the State had proven beyond a reasonable doubt that White had two previous DWI convictions and two previous felony convictions for retaliation and bail jumping. Thus, White was sentenced to twenty-five years' imprisonment, in accordance with the punishment range prescribed in section 12.42(d) of the penal code. *See* TEX. PENAL CODE ANN. § 12.42(d).

On appeal, White only challenges the enhancement of his sentence with respect to the felony retaliation and bail jumping convictions; he does not dispute the trial court's finding that he had been convicted previously of two DWIs. In proving that White had two prior felony convictions, the State submitted into evidence the judgments corresponding to White's retaliation and bail jumping convictions. The judgment pertaining to White's retaliation conviction reflected that White was placed on probation for the offense, and that the State filed its motion to revoke on July 9, 1994. White's probation was revoked on February 23, 1995, and he was sentenced to two years' confinement. Furthermore, the judgment corresponding to White's felony bail jumping conviction reflects that the offense was committed on March 31, 1995, and he was convicted of the offense on September 15, 1995. The trial court sentenced him to two years' confinement, to run concurrently with the sentence imposed in the retaliation case. White did not present any evidence indicating that either of these convictions were appealed. *See Milburn v. State*, 201 S.W.3d 749, 751 (Tex. Crim. App. 2006) (stating that a prior conviction is not final if defendant still has time to file a motion for new trial or a notice of appeal); *see also Jones*, 77 S.W.3d at 822-24.

The court of criminal appeals has held that a probated sentence is not a final

22

conviction for enhancement purposes under section 12.42 of the penal code unless probation is revoked and any appeal of the revocation has been resolved. *Jordan v. State*, 36 S.W.3d 871, 875 (Tex. Crim. App. 2001) (citing *Ex parte Langley*, 833 S.W.2d 141, 143 (Tex. Crim. App. 1992); *Ex parte Miller*, 552 S.W.2d 164, 165 (Tex. Crim. App. 1977)). Because the record does not reflect that White appealed his retaliation conviction, this conviction became final for purposes of enhancement on the date his probation was revoked—February 23, 1995. *See id.* Moreover, because White committed the offense of felony bail jumping on March 31, 1995, or, in other words, after his retaliation conviction became final, and because White's bail jumping conviction became final on September 15, 1995, before his conviction in the present case, we conclude that the State followed the proper sequence prescribed in section 12.42(d) of the penal code and proved beyond a reasonable doubt that White had been convicted previously of two felonies. *See* TEX. PENAL CODE ANN. § 12.42(d); *see also Ex parte Miller*, 2009 Tex. Crim. App. LEXIS 1486, at *35; *Jordan*, 256 S.W.3d at 291. As such, we cannot say that the enhancement of White's sentence under the habitual felony offender statute was supported by legally or factually insufficient evidence. *See Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (holding that in a legal sufficiency review, we view the relevant evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt); *see also Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006) (holding that in a factual sufficiency review, we review the evidence in a neutral light to determine whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust or against the great weight and preponderance of the evidence). We overrule White's second issue.

## V. THE JUDGMENT AND THE JURY'S VERDICT

In his final issue, White argues, for the first time on appeal, that the judgment did not constitute a unanimous verdict because it was rendered by eleven jurors and was signed only by the presiding juror. *See* TEX. CODE CRIM. PROC. ANN. art. 36.29. The State asserts that White waived any error by failing to object. It also argues that the judgment was valid because the jury was polled and each juror answered that the verdict was theirs.

### A. Applicable Law

"Under our state constitution, jury unanimity is required in felony cases, and under our state statutes, unanimity is required in all criminal cases." *Ngo v. State*, 175 S.W.3d 738, 745 (Tex. Crim. App. 2005). Pursuant to article 36.29 of the code of criminal procedure, not less than twelve jurors can render and return a verdict in a felony case, and the verdict must be "concurred in by each juror and signed by the foreman." TEX. CODE CRIM. PROC. ANN. art. 36.29(a) (Vernon Supp. 2009). Article 36.29 also provides that, in the event that a juror dies or becomes disabled from serving on the jury, "the remainder of the jury shall have the power to render the verdict." *Id.* "When the verdict shall be rendered by less than the whole number, it shall be signed by every member of the jury concurring in it." *Id.*

However, Texas courts, in construing article 36.29, have held that a defendant may waive the requirement of a jury comprised of twelve jurors by failing to object when the trial proceeded with eleven jurors. *See Hatch v. State*, 958 S.W.2d 813, 815-16 (Tex. Crim. App. 1997) (en banc) (holding that a defendant may waive the right to a jury composed of twelve persons in noncapital felonies and capital felonies where the prosecution does not seek the death penalty) (citing *McMillan v. State*, 122 Tex. Crim. 583, 57 S.W.2d 125

24

(1933)); *see also Shaw v. State*, No. 05-00-00186-CR, 2000 Tex. App. LEXIS 7740, at **6-7 (Tex. App.–Dallas Nov. 15, 2000, no pet.) (mem. op., not designated for publication) (holding that defendant waived error by failing to object in a case where the jury was comprised of eleven jurors, only the presiding juror signed the verdict, and the jurors were polled).

## B. Discussion

In this case, one juror was excused from serving on the jury and both parties agreed to proceed to verdict with eleven jurors, thereby waiving the requirement that the jury, in a felony case, must be comprised of twelve jurors. *See* TEX. CODE CRIM. PROC. ANN. art. 36.29(a); *see also Hatch*, 958 S.W.2d at 815-16. At no point did White object to (1) proceeding with eleven jurors, or (2) the verdict being signed only by the presiding juror. Because White agreed to proceed with eleven jurors, and because White failed to object to the verdict only being signed by the presiding juror, we conclude that White has waived this issue. *See* TEX. R. APP. P. 33.1(a); *Hatch*, 958 S.W.2d at 815-16; *Renner v. State*, 758 S.W.2d 890, 891 (Tex. App.–Corpus Christi 1988, pet. ref'd) (concluding that appellant waived his contention regarding an eleven-juror verdict signed by the presiding juror alone by failing to object at the trial court); *see also Shaw*, 2000 Tex. App. LEXIS 7740, at **6-7. Moreover, even if the lack of individual signatures on the jury's verdict was error, White was not harmed because: (1) the jurors were polled; (2) each juror expressed that the guilty verdict was their verdict; and (3) White did not request any additional polling of the jury. Therefore, any error associated with the omission of the individual signatures on the verdict form did not affect White's substantial rights and is, thus, harmless. *See* TEX. R. APP. P. 44.2(b); *see also Shaw,* 2000 Tex. App. LEXIS 7740, at *7. White's third issue is

25

overruled.

## VI. Conclusion

Because we have determined that: (1) White has failed to overcome the "strong presumption" that Gilmore provided reasonable assistance; (2) the enhancement of White's sentence was supported by legally and factually sufficient evidence; and (3) White waived any error associated with the jury's verdict, we conclude that the trial court did not abuse its discretion in denying White's motion for new trial. *See Holden*, 201 S.W.3d at 763; *see also Charles*, 146 S.W.3d at 208. Accordingly, we affirm the judgment of the trial court.

_____
DORI CONTRERAS GARZA
Justice

Do Not Publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
21st day of January, 2010.

26